**DYNALECTRIC COMPANY, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC COR-
PORATION and Davy McKee
Corporation, Defendants.**

**Civ. A. No. 92–1687.**

United States District Court,
D. New Jersey.

Sept. 11, 1992.

Jeffrey R. Cruz, Postner & Rubin, New York City, David G. Lane, Venable, Baetjer and Howard, McLean, Va., for Dynalectric Co.

Brian J. McMahon, Crummy, Del Deo, Dolan, Griffinger & Vecchone, Newark, N.J., for Westinghouse.

Robert D. Thompson, Pennington & Thompson, Cherry Hill, N.J., for Davy McKee Corp.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court upon a motion by defendants to dismiss the complaint, or in the alternative, to stay the case pending arbitration. For the following reasons, I deny defendants' motion to dismiss but grant their motion to stay.

### I. Motion to dismiss

Under Federal Rule of Civil Procedure 12(b)(6), "the court must accept as true all factual allegations in the complaint and view them in a light most favorable to plaintiff." *DP Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3rd Cir.1984); *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 780 (3rd Cir.1982). The court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Wiley v. Hughes Capital Corp.,* 746 F.Supp. 1264 (D.N.J.1990), (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80); *see also Johnsrud v. Carter,* 620 F.2d 29, 33 (3rd Cir.1980). Thus, the following factual background assumes that plaintiff's allegations are correct.

### II. Background

This case involves a contract and several subcontracts for the construction of a Cogeneration Facility near Sayreville, New Jersey, designed to provide electrical power in northern New Jersey.

On June 29, 1989, North Jersey Energy Associates, the owner and operator of the Facility, contracted with defendant Westinghouse Electric ("Westinghouse") for Westinghouse to furnish equipment and services for the design, construction and operation of the Facility. Westinghouse in turn entered into two subcontracts to effectuate its tasks. First, it contracted with

defendant Davy McKee Corporation ("Davy") for design and engineering services to develop plans and specifications for the construction of the Facility. Second, Westinghouse contracted with Dick Corporation ("Dick") for construction services, materials, labor, equipment, and supervision to accomplish most of the construction-related tasks necessary to the project.

On September 29, 1989, Dick subcontracted with plaintiff Dynalectric Company ("Dynalectric") for Dynalectric to install electrical systems for the Facility for an adjustable price of $5,900,000. Based on all the contracts involving the Facility, Dynalectric made projections for the scope of its sub-contract work, the completeness of the design of the Facility, and the schedule for construction of the Facility.

Dynalectric then began performing its obligations under the sub-contract. However, according to the complaint, Westinghouse and Davy continued to develop, modify and add to the original engineering, scope and design of the Facility well after Dynalectric began its performance. As a result, Dynalectric's work was delayed and disrupted, resulting in increased costs to Dynalectric.

In October 1989, Westinghouse and Dick developed an Integrated Project Schedule ("IPS"), which consolidated and sequenced certain design, procurement, construction, and start-up activities required of the relevant parties to build the Facility. The IPS contained dates for the issuance of electrical drawings, and provided the baseline against which Dynalectric planned its performance of the electrical installation work. However, Westinghouse and Davy were late in providing electrical design drawings, while they simultaneously increased the scope of the Facility Project. Specifically, Westinghouse ordered changes to the electrical installation work that required tens of thousands of extra hours of work. Moreover, Westinghouse and Davy periodically issued incorrect and/or incomplete electrical design drawings, and supplied major mechanical and electrical equipment to the Facility much later than scheduled.

During the course of the building of the Facility, Westinghouse and Davy significantly revised plans for the project, resulting in the need by Dynalectric to re-plan and re-evaluate purchased cable inventories and to re-purchase cable. Moreover, Westinghouse desired the electrical work to be accelerated, to be performed simultaneously with the installation of piping and instrumentation.

Dynalectric alleges that as a result of the revisions and the failure of defendants to adhere to the timetable, it incurred additional costs resulting from the necessity to delay and revise its performance obligations. While Dynalectric generally completed its performance under the sub-contract by about July 1991, it has not yet received compensation for these extra costs.

Because of the mammoth scope of the project at issue in this case, the relevant contracts contained detailed dispute-resolution provisions. The contract between Westinghouse and Dick provided that:

> Any dispute which shall arise as the obligations of either Party under this Subcontract or the interpretation of any provision thereof, if not settled by mutual agreement or unless otherwise agreed, shall be decided by arbitration in accordance with the Construction Industry Rules of the American Arbitration Association.

The Dick–Dynalectric subcontract contained a clause incorporating the entire agreement between Westinghouse and Dick. Moreover, it specifically provided that "The disputes provision of the Prime Contract shall govern and Subcontractor [Dynalectric] shall be afforded the right to pursue all appropriate remedies available to the Contractor [Dick] under its Prime Contract."

The Dick–Dynalectric contract also provided for a specific procedure that Dick would not be liable for delays due to Westinghouse and/or its agents, and provided a mechanism for Dynalectric to present claims for damages due to actions by Westinghouse or its agents:

If [Dynalectric] is delayed in the prosecution of its work due to the acts of [Westinghouse] and/or its agents and [Dynalectric] suffers delay damages therefrom, [Dick] agrees to transmit to [Westinghouse] any claims submitted to it by [Dynalectric]. [Westinghouse's] decision regarding such claims will be final and binding upon [Dynalectric].... [Dick] under this paragraph merely acts as a conduit to provide [Dynalectric] access to [Westinghouse] to seek reimbursement for damages incurred for delays cause by [Westinghouse] and/or its agents.

Finally, the contract provides that "[i]n the event of a lump sum settlement or award to [Dick] on behalf of a claim representing and including [Dynalectric's] claim, distribution of the proceeds shall be by mutual agreement."

In other words, the contracts provide that if Dynalectric suffers economic loss due to delays caused by Westinghouse or its agents (which includes Davy), it must submit those claims to Dick, who then submits them to Westinghouse.

Before the instant proceedings were instituted, Dynalectric presented to Dick a claim of $5,545,900 for additional compensation due under the subcontract. On December 2, 1991, Dick presented Dynalectric's claim to Westinghouse. The Claim was formally titled "Request of Dynalectric Company for Equitable Adjustment Under Sub–Subcontract Between Dick Corporation and Dynalectric Company."

On April 16, 1992, Dick filed a Demand for Arbitration against Westinghouse, which expressly incorporated Dynalectric's December 2, 1991 claim for additional compensation.

On April 21, 1992, Dynalectric filed this action, alleging that negligence on the part of Westinghouse and Davy caused it to suffer economic losses totalling $6.5 million. Dynalectric contends that these claims may not be arbitrated because they constitute tort claims and are not covered by the arbitration agreements.

In response to the Complaint, Westinghouse and Davy, in lieu of answering, filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted, under Fed.R.Civ.P. 12(b)(6); and for failure to join a necessary party, under Fed.R.Civ.P. 19. In the alternative, Westinghouse seeks to have this action stayed pending the outcome of the arbitration proceeding.

I turn to these motions now.

## III. Discussion

### A. Dick as a Necessary Party

First, Westinghouse contends that since Dick, a necessary party to the litigation, is not joined in this action, the case should be dismissed. I need not spend time on this issue, however, because even if I found Dick to be a necessary party, I would decline to use my authority to dismiss the litigation. Rather, as will be made clear below, staying this action pending arbitration is an equitable alternative to dismissal on the ground that a necessary party was not joined.

### B. Failure to State a Substantive Claim

Westinghouse's first argument is that the complaint should be dismissed under Rule 12(b)(6) because Dynalectric cannot recover in tort for purely economic damages and against parties it is not in privity with. Westinghouse primarily relies upon Pennsylvania law for these propositions, and Dynalectric argues in turn that New Jersey law applies. Therefore, to resolve the substantive issue, I must decide which state's law to apply.

#### i. Conflict of Laws

A federal court sitting in diversity must apply the choice of law rules of the forum state, see *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1940). Thus, New Jersey choice of law principles govern the choice of law in this case.

In determining which state's law applies to a given matter, New Jersey courts apply a governmental relationship test. Under this test, the Court first determines the governmental policies evidenced by the

laws of each related jurisdiction, and second the factual contacts between the parties and each related jurisdiction. *Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28, 32 (3d Cir.1975).

Even assuming that there is a conflict between Pennsylvania and New Jersey law, because I find that contacts with New Jersey clearly predominate in this litigation, I find that New Jersey law applies to this case.

In determining which state involves the most factual contacts, New Jersey has adopted a set of factors put forward by the Restatement (Second) Conflict of Laws. The Court is to consider:

1. the place where the injury occurred
2. the place where the conduct causing the injury occurred
3. the domicile, residence, nationality, place of incorporation, and place of business of the parties;
4. the place where the relationship, if any, between the parties, is centered.

Westinghouse makes a number of arguments why Pennsylvania has the most contacts. First, it notes that both defendants are organized and existing under the laws of Pennsylvania. While this fact does weigh in Westinghouse's favor, this fact by itself does not constitute a sufficient contact to warrant the application of Pennsylvania law.

Westinghouse then points out that plaintiff Dynalectric is not domiciled in New Jersey. Westinghouse cites *Henry v. Richardson–Merrell, Inc.*, 508 F.2d 28, 35 for the proposition that "New Jersey does not consider itself interested in nondomiciliary plaintiffs." Westinghouse misapprehends the import of that case. First, *Henry* involved an individual plaintiff living in Quebec, and injured in Quebec. It did not involve corporations that while domiciled in one particular state engage in business activity throughout the nation. Second, the Court of Appeals in *Henry* specifically held that the general rule that New Jersey is not interested in nondomiciliary plaintiffs "may be outweighed by other factors." *Henry* 508 F.2d at 35. The Court in fact hinted that a forum's interest in deterring future tortious activity was a significant enough interest that in some cases could outweigh the fact that a plaintiff is not a domicile. *Id.*

Third, Westinghouse contends that since this litigation in no way would impede the production of energy in New Jersey or affect employment in New Jersey, New Jersey has no interest in the litigation. However, in its brief, in the same paragraph, Westinghouse admits that its allegedly negligent conduct occurred in New Jersey as well as other states. And a case relied upon by Westinghouse for other propositions cited with approval the proposition that the deterrence of tortious conduct itself involves a significant interest on the part of a state. *Henry* 508 F.2d at 36. This is particularly relevant when a case involves an large cogeneration power plant, built for the North Jersey Energy Associates for the purpose of supplying electrical power to northern New Jersey.

On top of the facts that (1) the project is of mammoth scale; (2) the facility was built in Sayreville, New Jersey under hire from a New Jersey entity; (3) the facility was designed to supply electric power to northern New Jersey; and (4) allegedly negligent acts by Westinghouse and Davy occurred in New Jersey as well as other states, other factors militate in favor of the application of New Jersey law. First, Dynalectric's injury involves conduct by Westinghouse that allegedly forced Dynalectric to incur costs for New Jersey labor, materials, and equipment. Second, New Jersey law regulates the construction of projects within its boundaries. Third, the contracts at issue contained provisions providing that New Jersey substantive law would govern any disputes between the parties. While the complaint sounds in tort rather than contract, the choice-of-law provisions do evidence that the parties recognized that New Jersey was the center of the relationship.

Therefore, I find that New Jersey law applies.

Having decided the choice-of-law question, I now must determine whether Dyna-

lectric has stated a claim upon which relief can be granted.

### ii. New Jersey Law

Westinghouse and Davy next argue that since Dynalectric and Westinghouse are not in privity, and since the "economic loss" doctrine prohibits Dynalectric for recovering in tort for purely economic losses, Dynalectric's negligence claims must be dismissed. Dynalectric, on the other hand, argues that New Jersey law clearly allows such tort claims. The correct answer is somewhere in between.

■ The first question is whether New Jersey utilizes the economic loss and privity doctrines as a matter of course.

In 1980, the Law Division of the Superior Court of New Jersey found itself faced with a question similar to the one before this court: "Is a design professional answerable in tort to a contractor who sustains economic damages as a result of the negligence of the design professional in the absence of privity of contract?" *Conforti & Eisele v. John C. Morris Assocs.*, 175 N.J.Super. 341, 342, 418 A.2d 1290 (1980). Noting that "[t]he tendency in New Jersey [is] to look upon the privity defense with disfavor....", *Id.* 175 N.J.Super. at 343, 418 A.2d 1290, and that "[a] growing number of courts faced with a similar issue have discarded the privity doctrine and allowed third-party contractors to maintain their actions against design professionals in negligence," *Id.* 175 N.J.Super. at 344, 418 A.2d 1290, the Court answered the question in the affirmative. While Westinghouse is correct in noting that the New Jersey Supreme Court affirmed only the decision in that case, not the reasoning, the Supreme Court has provided the reasoning in a subsequent case concerning the economic loss doctrine.

In *People's Express Airlines Inc. v. Consolidated Rail.*, 100 N.J. 246, 495 A.2d 107 (1985), the New Jersey Supreme Court decided whether the economic loss doctrine establishes a *per se* rule against recovery of purely economic loss. While addressing that particular issue, the Court also shed light upon New Jersey's approach to tort doctrine, an approach which concerns the privity doctrine as well. After reviewing the history of New Jersey's gradual disfavoring of the economic loss doctrine, the Court concluded that in any tort case, the real issue is foreseeability. As the court put it, "[w]hen the plaintiffs are reasonably foreseeable, the injury is directly and proximately caused by defendant's negligence, and liability can be limited fairly, courts have endeavored to create exemptions to [the economic loss doctrine] to allow recovery." *People's Express* 100 N.J. at 261, 495 A.2d 107. Applying this logic, the Court stated:

> We hold therefore that a defendant owes a duty of care to take reasonable measures to avoid the risk of causing economic damages, aside from physical injury, to particular plaintiffs or plaintiffs, comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct. A defendant failing to adhere to this duty of care may be found liable for such economic damages proximately caused by its breach of duty.

*Id.* 100 N.J. at 263, 495 A.2d 107. I find that this logic goes beyond the economic loss doctrine and applies to the privity of contract doctrine as well. The privity of contract doctrine, fashioned in other times, also normally works to "condon[e] a [party's] right to do his job negligently but with impunity as far as innocent third parties who suffer economic loss." *Conforti* 175 N.J.Super. at 344, 418 A.2d 1290. New Jersey has decided to discard these formalistic doctrines in favor of a more commonsensical "foreseeability" and "proximate cause" rule.

However, while New Jersey generally rejects the "privity of contract" and the *per se* "economic loss" doctrines, that fact does not necessarily mean that Dynalectric is entitled to recover. Rather, a careful reading of New Jersey Supreme Court cases presents a situation in which the evisceration of these formalistic doctrines is tied to the unavailability of other modes of recovery. Therefore, if a party is able to

pursue remedies in another way, for instance, if the claims can be characterized as contract claims that may be arbitrated, it may not supplement its claims with allegations of negligence.

For instance, the Court in *People's Express*, while enunciating liberal tort law principles, backed up its holding by reference to policies. In arriving at its decision, the Court stated that "[o]ne objective [of tort law] is to ensure that innocent victims have avenues of legal redress, absent a contrary, overriding public policy." *People's Express* 100 N.J. at 255, 495 A.2d 107. Further, the Court noted that tort law should "not unnecessarily or arbitrarily *foreclose redress* based on formalism or technicalisms." *Id.* 100 N.J. at 255, 495 A.2d 107 (emphasis added). In other words, underlying the Court's holding was its belief that "wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." *Id.* 100 N.J. at 255, 495 A.2d 107. Ensuring an avenue to address a grievance is much different from ensuring that the avenue of tort law is always available. Lest anyone come away from the opinion thinking that the Court established an absolute right of tort recovery for economic loss, the Court stated in conclusion that:

> We recognize that some cases will present circumstances that defy the categorization here devised to circumscribe a defendant's orbit of duty, limit otherwise boundless liability and define an identifiable class of plaintiffs that may recover. In these cases, the courts will be required to draw upon notions of fairness, common sense and morality to fix the line limiting liability as a matter of public policy, rather than an uncritical application of the principle of particular foreseeability.

*Id.* 100 N.J. at 264, 495 A.2d 107 (citations omitted).

While the New Jersey Superior Court found in *Conforti* that lack of privity of contract does not bar a claim of negligence, it too tied its decision to an equitable policy: "To deny this plaintiff his day in court

would, in effect, be condoning a design professional's right to do his job negligently but with impunity as far as innocent third parties who suffer economic loss." *Conforti,* 175 N.J.Super. at 344, 418 A.2d 1290. Like the Supreme Court in *People's Express,* the Law Division also was concerned with ensuring a avenue for the redress of legal grievances.

■ In light of the above discussion, I find that under New Jersey law, when a party has suffered economic loss because of the negligent actions of another, and the party has another means of redress against the alleged tortfeasor, that party may not assert the identical claims for identical damages under tort theories.

The question then becomes whether Dynalectric has another avenue of redress.

### iii. The Arbitration Agreements

■ The question of whether the arbitration clauses in the contracts gives Dynalectric an alternative means of redress can best be answered by asking (1) whether Dynalectric was authorized or mandated to arbitrate the allegations in the instant complaint; and (2) whether those allegations are currently being arbitrated without objection.

In a series of cases over thirty years ago, the Supreme Court addressed the issue of arbitration over thirty years ago. The Court articulated several principles: (1) for a claim to be arbitrable, the parties must have agreed to submit to arbitration. *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); see also *Laborers' Intern. Union v. Foster Wheeler Corp.,* 868 F.2d 573, 576 (3d Cir.1989). (2) the judge must determine whether there is a duty to arbitrate and what issues must go to arbitration. *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53; *Foster Wheeler,* 868 F.2d at 576; (3) in determining whether the parties have agreed to submit a grievance to arbitration, a court is not to rule on the merits of the claim. *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960); (4) where the contract

contains an arbitration clause, there is a presumption of arbitrability, and this presumption applies with special force where the clause is broad. *Warrior & Gulf,* 363 U.S. at 584–85, 80 S.Ct. at 1354. See also *AT & T Technologies v. Communications Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986).

Dynalectric argues that it never agreed to have the claims in the instant case arbitrated. I disagree. I find that the issues raised in this case are arbitrable under the relevant contracts and that Dynalectric has a duty to submit the claims to arbitration.

Dynalectric contends that the language of the disputes clause in the Westinghouse/Dick contract, which is incorporated into the Dick/Dynalectric contract, "clearly limits arbitration to disputes concerning obligations between Westinghouse and Dick under their contract or disputes raising issues of interpretation of that contract." That is precisely what this case involves—allegations involving breaches of Dynalectric's legitimate expectations concerning the parties' obligations under the various contracts. Other parts of the contracts confirm this interpretation. For example, the Dick/Dynalectric contract not only incorporates the entire Westinghouse/Dick contract, it also provides that

> The disputes provision of the Prime Contract shall govern and [Dynalectric] shall be afforded the right to pursue all appropriate remedies available to [Dick] under its Prime Contract.

Further, the Dick/Dynalectric contract provides that "[Dynalectric] shall have the benefit of all rights, remedies, and redress against [Dick] which [Dick] has against [Westinghouse]." Finally, the Dynalectric/Dick contract contains a clause providing that:

> If [Dynalectric] is delayed in the prosecution of its work due to the acts of [Westinghouse] and/or its agents and [Dynalectric] suffers delay damages therefrom, [Dick] agrees to transmit to [Westinghouse] any claims submitted to it by

[Dynalectric] ... It is agreed that in no event will [Dick] be liable for [Dynalectric's] claims for delay, [Dick] under this paragraph merely acts as a conduit to provide [Dynalectric] access to [Westinghouse] to seek reimbursement for damages incurred for delays caused by [Westinghouse] and/or its agents.

While Dynalectric argues that this clause "cannot be read in any way to modify or expand any agreement by Westinghouse and Dick (or Dick and Dynalectric) to arbitrate their *inter se* contract claims", I find that when read in the context of the other provisions, the parties clearly contemplated that its procedure for dispute resolution would be followed by the parties for all claims arising out of the contracts. This approach also encourages efficiency and protects the interests of all parties.[1]

Moreover, comparing Dynalectric's arbitration claim (the "claim") with its complaint in this court ("complaint") demonstrates that, at any rate, the allegations in the Complaint are already in arbitration, without objection, so Dynalectric is pursuing another means of redress.

■ Dynalectric argues, in both its complaint and indirectly through the Dick arbitration claim, that it reasonably developed certain expectations regarding the project, and that Westinghouse and Davy did not live up to those expectations.

The first set of breached expectations involves the subcontract documents. The claim states that "[Review of the subcontract documents] led Dynalectric to develop certain realistic and informed expectations concerning Dick's scope of work, the relative completeness of the detailed design at bid time, and the overall schedule for the Project." *Claim* at 5. Similarly, the complaint alleges that "[r]elying on this Subcontract documents package, Dynalectric formulated realistic and justifiable expectations concerning (a) the scope of the Sub-Subcontract work, (b) the relative completeness of the detailed design at the time of its proposal, and (c) the overall schedule for

---

1. Dynalectric contends that under the contracts, it has no right to be a party to the arbitration proceedings. Still, Dynalectric agreed to the dispute resolution procedure outlined in the contracts.

construction of the Facility." *Complaint* at ¶ 13.

Specifically,

Dynalectric quickly gained an understanding from these provisions that:

(1) Westinghouse would timely provide Dick with those drawings, specifications, and other information reasonably required for the execution of the Work required for the project; and

(2) The general Scope of Work was that scope "designated by Westinghouse in the Appendices or as reasonably inferred from the drawings, specifications and Appendices which constituted the Contract documents at bid time....

Dynalectric personnel reasoned that Dick was legitimately entitled to be compensated for both the extra cost and time associated with design revisions and extra work, *i.e.*, work which was not specifically depicted on the drawings, specifications and Appendices, or reasonably to be inferred therefrom."

*Claim* at 7–8; *Complaint* at ¶ 15.

Regarding the time schedule, Dynalectric was "led to the legitimate contract expectations that (i) the bulk of the actual electrical construction activities would be performed in the 11–month period between April 1990 and March 1, 1991, (ii) construction and pre-operational testing would commence in the fall of 1990 and would be substantially completed by March 1, 1991, and (iii) electrical work would be performed in accordance with completed CFC drawings issued prior to construction of the work depicted therein." *Claim* at 11; *Complaint* at ¶ 19.

Both the Claim and the Complaint allege that Westinghouse and/or its agents breached these promises, causing damages to Dynalectric.

The second set of expectations involves the IPS. According to Dynalectric, the IPS was "the baseline upon which Dynalectric on-site personnel actually planned the performance of its electrical installation work." *Claim* at 13; *Complaint* at ¶ 22. "Although the IPS clearly specified when the CFC drawings were to be completed and issued, all of the schedule dates were missed." Consequently, "late design delayed and extended the original electrical activities...." *Claim* at 22. Additionally, mechanical and electrical equipment arrived late, Westinghouse or Davy kept revising its needs, and simultaneously accelerated the schedule for electrical work, thereby aggravating workflow conditions.

There is no question that the Claim and the Complaint allege that Westinghouse, by creating contractual expectations and then breaching them, caused damages to Dynalectric. The only substantive difference between the Claim and the Complaint that I can discern is that the language of the complaint occasionally uses such "tort" words like "foreseeability" and "negligently." [2] But using the analysis set forth by the New Jersey Supreme Court, I find that under all the relevant criteria, the allegations in Dynalectric's Complaint are currently in arbitration.

Thus, the claims alleged in Dynalectric's complaint may not at this juncture be actionable in tort. But I find that dismissal is too drastic a remedy. Instead I will stay the matter pending arbitration. [3]

### Conclusion

For the reasons detailed above, I deny defendants' motion to dismiss but grant defendants' motion to stay the matter pending arbitration.

---

**2.** Dynalectric also argues that Davy is not a party to the arbitration. But through the mechanism agreed to, Dynalectric may assert claims against Davy through Westinghouse.

**3.** If any party objects to the arbitration award, it may appeal to this court to vacate the award. 9 U.S.C. § 10.