**CONCERN SOJUZVNESHTRANS,**
Plaintiff,

v.

**Lev Mikhailovich BUYANOVSKI, Vladimir Aleksandrovich Emerel and Interform USA, Inc., Defendants.**

**No. Civ.A. 98–4490.**

United States District Court,
D. New Jersey.

Aug. 31, 1999.

Randall K. Anderson, Fishman, Herrmann & Anderson, New York City, NY, Samuel H. Turetsky, Passaic, NJ, for plaintiff.

Eric Wertheim, New York City, NY, for defendant Lev Buyanovsky.

Val Mandel, New York City, NY, Michael Edelson, Hellring Lindeman Goldstein & Siegal, Newark, NJ, for defendant Aleksandrovich Emerel.

## OPINION

WOLIN, District Judge.

Before the Court are the motions of defendants Lev Buyanovsky ("Buyanovsky") and Vladimir Emerel ("Emerel") (together, "defendants") to dismiss plaintiff's Complaint for failure to state a claim upon which relief can be granted.[1] The Court has decided the matters on the papers pursuant to Rule 78. For the following reasons, the Court will grant in part and deny in part defendants' motions for dismissal.

## BACKGROUND

Plaintiff Concern Sojuzvneshtrans ("SVT") is a corporation established and existing under the laws of the Russian Federation. Buyanovsky is a Russian citizen with permanent residence status in the United States. Buyanovsky lives in Holmdel, New Jersey, and is president and one of two principal stockholders of defendant Interform USA, Inc. ("Interform"). Emerel is a Russian citizen with permanent resident status in the United States. Emerel also lives in Holmdel, New Jersey, and is an officer and the second principal stockholder of Interform. Interform is a New York corporation with a principal place of business identified as Buyanovsky's residence in Holmdel, New Jersey. (Complaint ¶ 1–7).[2]

In August 1994, SVT entered into a series of agreements with PTKC Znamya Revolyutsii ("PTKC"), a Russian corporation owned and directed by Buyanovsky and Emerel. (*Id.* at ¶ 8–9.) Under the agreements, SVT provided freight forwarding service to PTKC. SVT agreed to arrange for the transportation of cargoes of phosphorous from Kazakhstan to various foreign countries and the return of the empty freight cars to Kazakhstan. (*Id.* at ¶ 8.) When PTKC needed to make a shipment it would provide an order with necessary shipping information to SVT (e.g., number and type of freight cars and tonnage), which would in turn supply to PTKC information for completion of the bills of lading necessary to have the rail cars transported by the various national railroads. (*Id.* at ¶ 10.) This information included codes that caused the shipments

---

1. Buyanovsky and Emerel have each joined the other's motion.

2. Defendants incorporated a second corporation named Interform USA, Inc., in New Jersey, but dissolved the company in 1997.

to be charged to SVT by the railroads and paid from SVT's deposits with the railroads. (*Id.*) PTKC supplied this information to a company called "Nodfos", its supplier in Kazakhstan, and Nodfos would place the information on bills of lading and ship the phosphorous. (*Id.*) SVT also sent or faxed a telegram to the appropriate departure station notifying it of the shipment and the code applied to the shipment. (*Id.*)

The parties made several shipments under these arrangements during 1994 and 1995. Although PTKC did not reliably make payments, eventually all payments were made for shipments during those period. (*Id.* at ¶ 11.)

In 1996, shipments increased significantly and PTKC began to fall further behind in its payments.[3] In 1996, Buyanovsky and Emerel began to have Interform issue the bill of lading instructions to Nodfos rather than have PTKC forward the SVT instructions. (*Id.* at ¶ 12.) On numerous occasions defendants caused Interform to issue instructions (through the telecommunications system of the United States) that had not been obtained from SVT and/or to re-use prior instructions without authorization from SVT. (*Id.* at ¶ 13; Counts 1–23.) The invented or altered instructions issued by Interform contained codes and other instructions that caused unauthorized shipments to be charged by the railroads to SVT. (*Id.* at ¶ 14.) Due to the inefficiency of the billing systems of the railroads in the former USSR states, SVT did not learn of any of the unauthorized shipments until March, 1997. (*Id.* at ¶ 15.) From August 1996 to February 1997, PTKC requested and received authorization for shipments from SVT, reportedly in addition to the unauthorized shipments. (*Id.* at ¶ 16.) SVT stopped authorizing shipments for PTKC in February 1997 because of the considerable arrears PTKC owed. (*Id.* at ¶ 16.)

Defendants Buyanovski and Emerel met with representatives of SVT in Moscow on February 14, 1997. During that meeting, Emerel confirmed in writing that SVT was owed $713,619.55 (USD) for PTKC shipments. (*Id.* at ¶¶ 17–18.) Emerel explained that PTKC was having difficulty but would pay the debt over the course of the following year. Neither Emerel nor Buyanovsky disclosed the unauthorized shipments. (*Id.* at ¶ 18.) PTKC also agreed to prepay further shipments at a premium rate. (*Id.*)

SVT agreed to arrange for shipment of twenty-four tanks of yellow phosphorous as the first shipment under the new agreement. (*Id.* at ¶ 19.) Only one shipment was made under this arrangement before SVT discovered the unauthorized shipments and refused to transport further cargoes for PTKC. (*Id.* at 20.) SVT claims that at least 246 rail cars were moved in unauthorized shipments. (*Id.*)

In its Complaint, SVT charges defendants with issuing letters of instructions to Nodfos during the period August 1996 through March 1997. (*Id.* at ¶ 106.) Specifically, SVT alleges that each of the fraudulent instructions were sent through the telecommunications system of the United States in violation of 18 U.S.C. § 1343 (wire fraud) and thus violated 18 U.S.C. § 1962(c) (Racketeer Influenced and Corrupt Organizations Act, hereinafter "RICO"). (*Id.* at ¶¶ 109, 110.) SVT alleges that Buyanovsky and Emerel conducted the business (and conspired to conduct the business) of defendant Interform and PTKC through a pattern of racketeering activity in violation of RICO at 18 U.S.C. § 1962(c) & (d). (*Id.* at ¶¶ 110, 112.) SVT further alleges that defendants' issuance of false instructions and false statements to SVT defrauded plaintiff of substantial sums of money. (*Id.* at ¶ 114.)

---

**3.** PTKC now owes SVT more than $700,000 (USD), but this debt is not part of the instant action. (*Id.*)

Defendants move for dismissal for failure to state a claim upon which relief can be granted. Defendants raise four objections, concerning (1) the statute of limitations, (2) compliance with Rule 9(b), (3) the continuity requirement of RICO, and (4) extraterritorial application of RICO.

**Motion to Dismiss Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a complaint to be dismissed for failure to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all allegations in the complaint, and must provide the plaintiff with the benefit of all inferences that may be fairly drawn from the complaint. *See, e.g., Wilson v. Rackmill,* 878 F.2d 772, 775 (3d Cir.1989). A complaint cannot be dismissed unless the court is certain that no set of facts can be proved that would entitle plaintiff to relief. *See id.; Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). On such motion, the Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint and matters of public record. *See Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998).

**DISCUSSION**

**A. Whether Plaintiff's RICO Claims Should be Dismissed for Lack of Subject–Matter Jurisdiction**

The Court considers first defendants' contention that this Court lacks subject-matter jurisdiction over plaintiff's RICO claims because they involve transactions "which took place wholly outside of the jurisdiction of the United States ... and had no effect in the United States."

The RICO Act reveals little with regards to its extraterritorial[4] application, and the Third Circuit does not appear to have had the opportunity to decide the issue. Some thought has been given to analyzing the scope of RICO based on precedent concerning subject-matter jurisdiction for international securities transactions and antitrust matters, but no clear standard has emerged. *See, e.g., North South Finance Corp. v. Al–Turki,* 100 F.3d 1046, 1051–52 (2d Cir.1996) (on one hand taking guidance from the "conduct test" and "effects test" adopted from international securities frauds analysis, but on the other hand noting that the court was "not at all clear ... that the conduct test, as it has developed in foreign securities fraud cases, governs in cases involving the extraterritorial application of RICO"); *see also Butte Mining PLC v. Smith,* 76 F.3d 287, 291–92 (9th Cir.1996) (not explicitly applying international securities frauds analysis but implicitly acknowledging worth of analysis by distinguishing its case from another in which both the "conduct test" and "effects test" were satisfied).

 Notwithstanding the lack of a coherent standard, this Court determines that, at times, it may be useful to apply a

4. The Court notes that the nature of this action only involves extraterritorial application of RICO with regard to allowing a foreign plaintiff to sue in the United States District Court for a scheme that took place, in large part, on foreign soil. Defendants are New Jersey residents and Interform's principal place of business is Buyanovsky's home in New Jersey. The Court considers whether defendants' conduct in the United States allows this Court to assume jurisdiction over the claims. *See North South Finance Corp. v. Al–Turki,* 100 F.3d 1046, 1051 (2d Cir.1996) (" '[W]e entertain suits by aliens only where conduct material to the completion of the fraud occurred in the United States.' ") (citation omitted).

"conduct test" to RICO jurisdictional issues.[5] The instant case presents just such an occasion.

■ Under the conduct test, the court possesses subject-matter jurisdiction "where conduct material to the completion of the fraud occurred in the United States." *Psimenos v. E.F. Hutton & Co., Inc.,* 722 F.2d 1041, 1046 (2d Cir.1983). "Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction. Only where conduct 'within the United States directly caused' the loss will a district court have jurisdiction." *Id.* at 1046 (quotation omitted).

Here, the conduct alleged to have occurred in the United States was material to the fraud perpetrated and a direct cause of the loss to SVT. It was not merely preliminary or preparatory. *Cf. Butte Mining PLC v. Smith,* 876 F.Supp. 1153, 1166 (D.Mont.1995) (in overseas stock fraud scheme, acquisition of mining properties in Montana, formation of Montana shell corporations, and vesting of title to properties in Montana were determined to be preliminary acts; key fraudulent act occurred when the final Listing Particulars (which contained alleged misrepresentations and omissions with regard to the properties) were placed in plaintiff's hands in England), *aff'd* 76 F.3d 287 (9th Cir. 1996). Plaintiff alleges that Buyanovsky and Emerel caused Interform—a corporation owned by the defendants and run out of Buyanovsky's residence in New Jersey—to issue the fraudulent orders and instructions from its office in Holmdel, New Jersey, to Nodfos in Kazakhstan. Thus, it is clear that the key fraudulent acts themselves—the sending of the falsified shipments orders—originated in and emanated from New Jersey. Accordingly, the Court finds that it has subject-matter jurisdiction to hear plaintiff's RICO claims.

Although Congress may not have intended RICO to punish frauds by aliens abroad if only peripheral preparations were taken by them here, *see Turki,* 100 F.3d at 1053, in cases where the key fraudulent acts generate in and project from the United States, the Court finds it doubtful that Congress meant for exporters of racketeering activity to profit from their illegal conduct in the United States while remaining insulated from this territory's laws. *See Madanes v. Madanes,* 981 F.Supp. 241, 250 n. 6 (S.D.N.Y.1997) (stating that Congress' reasons for not wanting the United States to be used as a base for peddling fraudulent security devices for export are likewise applicable to exportation of racketeering activity); *see also* Kristen Neller, Note, Extraterritorial Application of RICO: Protecting U.S. Markets in a Global Economy, 14 Mich.J. Int'l L. 357, 380 (1993) (arguing that extraterritorial application of RICO is "logical because of the statute's similarity in purpose and interpretation of the courts to antitrust and securities laws").

For the aforementioned reasons, the Court will deny defendants' motion to dismiss plaintiff's RICO claims.

## B. Whether Plaintiff's RICO Claims Should be Dismissed for Failure to Allege a Pattern of Racketeering Activity

■ In order to assert a RICO claim under 18 U.S.C. § 1962(c) & (d), a plaintiff must allege (1) the conducting of (or conspiracy to conduct), (2) an enterprise, (3) that affects interstate or foreign commerce (4) through a pattern, (5) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); 18 U.S.C. § 1962(c) & (d). Defendants challenge that plaintiff has not asserted claims sufficient to establish a pattern of racketeering activity.

---

**5.** The Court would likely reach a similar result with respect to the "effects" test, but need not consider effects as part of the analysis in the instant case. The Court does take this opportunity to note, however, that plaintiff's Complaint on its face asserts activity that affects foreign commerce. *See* 18 U.S.C. § 1962(c) & (d).

Particularly, defendants contend that the alleged pattern of racketeering activity was not continuous. *See Hindes v. Castle,* 937 F.2d 868, 872 (3d Cir.1991) (to be considered a pattern, predicate criminal acts must (1) be related, and (2) establish, or pose a threat of, continuing activity) (citation omitted).

■ Continuity may be determined by showing either an open or closed-ended period of predicate acts or offenses. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Continuity refers to "a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.*

■ Although there is no definitive length of time for establishing a closed-ended period, the Third Circuit has noted that, in each case before it, it has held that "conduct lasting no more than twelve months did not meet the standard for closed-ended continuity." *See Tabas v. Tabas,* 47 F.3d 1280, 1293 (3d Cir.1995) (citing *Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir. 1991) (conduct lasting twelve months insufficient to establish closed-ended continuity); *Hindes v. Castle,* 937 F.2d at 875 (eight month period of predicate acts without further threat did not satisfy closed-ended continuity standard); *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1413 (3d Cir.1991) (same)) (other citations omitted).

In the instant case, SVT charges defendants with issuing letters of instructions to Nodfos during the period August 1996 through March 1997. (*Id.* at ¶ 106.) Thus, notwithstanding plaintiff's opposition to defendants' motions (stating that "it may well be that the scheme here exceeded twelve months"), it is clear that the Complaint does not allege predicate acts of sufficient duration to meet the closed-ended continuity standard. Accordingly, the Court finds that plaintiff has failed to allege a continuous pattern of racketeering activity on the basis of a closed-ended period.

■ Plaintiff asserts that, even if closed-ended continuity is not established, this case meets the standard for open-ended continuity. Open-ended continuity is established by showing a threat of continuing racketeering activity. *See H.J. Inc.,* 492 U.S. at 241–43, 109 S.Ct. 2893. A threat of continuing activity may be proven where the circumstances suggest that the predicate acts are a regular way of conducting business and likely to be repeated. *See Tabas,* 47 F.3d at 1295 (citation omitted); *Hughes,* 945 F.2d at 610. Whether the threat existed should be determined by considering the situation at the time the acts were being committed; thus, it is no defense to argue that a threat of continuing activity did not exist because the scheme was discovered. *See Thomas v. Ross & Hardies,* 9 F.Supp.2d 547, 554 (D.Md.1998) (finding open-ended continuity where "the scheme ended not because a limited goal had been accomplished, but because the perpetrators were caught"); *Seneca Ins. Co. v. Commercial Transp., Inc.,* 906 F.Supp. 239, 243 (M.D.Pa.1995) ("reasonable to assume that[,] but for Plaintiffs' discovery of the fraud, the conduct would have continued into the future").

Here, falsifying ordering instructions became the routine way of placing shipments. Plaintiff alleges that 246 rail cars were moved in unauthorized shipments. At the February 1997 meeting in Moscow, defendants made no mention of the unauthorized shipments and continued to fraudulently authorize shipments after a new working relationship had been entered into between the parties. It is therefore clear that defendants' scheme posed a continuing threat of racketeering activity. Defendants intended to further defraud plaintiff and were thwarted in their attempts solely by virtue of plaintiff's discovery of defendants' scheme. Defendants' motions to dismiss plaintiff's RICO claims will, accordingly, be denied on this point.

## C. Whether Plaintiff's Fraud Claims are Time–Barred

Plaintiff does not assert in its Complaint what law is to govern its non-RICO fraud claims. Defendants charge that either Russia's or Kazakhstan's statute of limitations applies in this case. Plaintiff disagrees and argues that New Jersey's statute of limitations should apply.

■ A federal court sitting in diversity must utilize the choice of law rules of the state in which it sits. *See Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New Jersey courts have implemented the governmental-interest approach to choice-of-law questions, which requires application of the law of the state with the greatest interest in resolving the particular issue raised by the underlying litigation. *See, e.g., Gantes v. Kason Corp.,* 145 N.J. 478, 484–493, 679 A.2d 106 (1996). "The initial prong of the governmental-interest analysis entails an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis." *Id.* at 484, 679 A.2d 106 (citing *Veazey v. Doremus,* 103 N.J. 244, 248, 510 A.2d 1187 (1986)). In the absence of an actual conflict, the law of the forum state—in this case, New Jersey—is applied. *See Schreiber v. Camm,* 848 F.Supp. 1170, 1174 (D.N.J.1994) (citing, in part, *Schum v. Bailey,* 578 F.2d 493, 497 (3d Cir.1978)). If a conflict is found to exist, however, the court next determines the governmental policies of each jurisdiction and then considers the factual contacts between the parties and each jurisdiction to determine which government has a greater interest in having its law applied. *See Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975); *Pine v. Eli Lilly & Co.,* 201 N.J.Super. 186, 191–95, 492 A.2d 1079 (App.Div.1985).

### 1. Whether a Conflict of Law Exists

There is no doubt that a conflict exists in this case. Article 159(9) of the Civil Code of the Republic of Kazakhstan applies to a "transaction concluded under the influence of fraud ... which the other party took advantage of." Article 179 of the Civil Code of the Russian Federation reads substantially the same.[6] The statutes of limitations applying to both codes require the filing of a complaint grounded upon an invalid transaction due to fraud to be asserted as follows:

> within a year from the date of the termination of the coercion or threat under whose influence the transaction was concluded, or from the date the plaintiff knew or should have known about other circumstances which are grounds for deeming the transaction to be invalid. (Civil Code of the Republic of Kazakhstan Art. 162) (Civil Code of the Russian Federation Art. 181(2)).

Thus, both Kazakhstani and Russian law required plaintiff to file his Complaint alleging fraud within one year from discovery of the alleged scheme.

In contrast, the applicable statute of limitation in New Jersey is six years. *See* N.J.S.A. 2A:14–1. Because plaintiff did not file until eighteen months after discovery, the question of which statute of limita-

---

**6.** Plaintiff argues that Article 179 of the Civil Code of the Russian Federation pertains to fraudulent inducement only and that the general three-year statute of limitations contained in Article 196 applies to the fraud alleged in this case. The Court acknowledges that a strictly literal reading of Article 179 might suggest that it relates only to frauds actually conducted between "one party with the other party," but determines that such a construc-

tion is unreasonable. Article 179 clearly is meant to apply to claims of fraud generally, and, without case law to support plaintiff's argument, the Court accepts that Article 179 should be read substantially the same as Article 159(9) of the Civil Code of the Republic of Kazakhstan, which does not use the words "one party with the other party" except as they relate to "ill-intentioned" agreements—in other words, fraudulent contracts.

tions to apply is critical to the advancement of plaintiff's fraud claims.

## 2. Governmental Policies

It has been noted that, in the tort context, the primary governmental interests are compensation and deterrence. *See Republic of the Philippines v. Westinghouse Elec. Corp.*, 774 F.Supp. 1438, 1449 (D.N.J. 1991); *Pine*, 201 N.J.Super. at 192, 492 A.2d 1079. The policy behind compensation generally reflects the government's interest that the injured domiciliary "not become a charge on its society and that he be restored, if possible, to productivity." *Schum v. Bailey*, 578 F.2d 493, 501 (3d Cir.1978) (Gibbons, J., concurring). The second governmental interest is one of deterrence. "That policy is based on the assumption that exacting compensation from a wrongdoer will deter his future misconduct, and is ordinarily associated 'with the sovereignty in which past misconduct took place and in which future misconduct may occur.'" *Pine*, 201 N.J.Super. at 192, 492 A.2d 1079 (quoting *Schum*, 578 F.2d at 501).

## 3. Factual Contacts

■ The last step in the governmental-interest test involves an analysis of the factual contacts between the parties and each related jurisdiction, including (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship between the parties, if any, is centered. *See Dynalectric Co. v. Westinghouse Elec. Corp.*, 803 F.Supp. 985, 989 (D.N.J.1992).

■ Considering the factual contacts of the parties as they relate to the interests of each jurisdiction, the Court finds that there is no question but that either the Kazakhstani or Russian statute of limitations applies to plaintiff's fraud claims. Plaintiff is a Russian corporation. It has no connection to New Jersey, does no business here, and has not purposely availed itself of New Jersey. Because it is not a New Jersey domiciliary, New Jersey has virtually no policy interest in compensating plaintiff. *See Republic of the Philippines*, 774 F.Supp. at 1449 (stating that, because the plaintiff "is the Republic of the Philippines, obviously New Jersey can have no policy interest in providing compensation, as it would in a case where the plaintiff is a New Jersey domiciliary"); *Pine*, 201 N.J.Super. at 193, 492 A.2d 1079 ("compensation of New Jersey domiciliaries is the overriding state governmental interest"). In contrast, Russia and Kazakhstan clearly have strong interests in determining when plaintiff should be compensated because SVT is a Russian corporation that appears to do business in both jurisdictions. Accordingly, regarding compensation, this Court determines that Russia and Kazakhstan have a greater compelling interest than New Jersey.

The factual contacts as they pertain to deterrence also weigh in favor of Kazakhstan and Russia. Plaintiff grounds its general claims for fraud upon the "issuance of false instruction and false statements to SVT, including those made at the above mentioned meeting in Moscow." (Complaint at ¶¶ 114–116.) Plaintiff's fraud claims thus differ from its RICO claims—which pertained to specific fraudulent acts conducted in New Jersey—in that all other transactions between the parties took place overseas. Accordingly, New Jersey has no deterrent interest in plaintiff's specific claims for fraud.

To the extent that plaintiff means to sue for fraud based on the issuance of the fraudulent instruction in New Jersey to Nodfos in Kazakhstan, and the resulting shipping of freight, the Court still finds that New Jersey has a lesser interest than Russia or Kazakhstan in deterring defendants. Although New Jersey has some interest in precluding fraudulent activities from taking place within its borders by its residents, the sending of the instructions was only a portion of the fraud, the other

parts consisting of the receipt of the faxes and the consequent shipments and billings, all of which took place overseas. Furthermore, the relationship between the parties took place entirely abroad, and the alleged injury occurred to a Russian company. Based on these facts, the Court concludes that New Jersey's interest in deterrence is somewhat less than the government interests of Russia and Kazakhstan.

Because the Court determines that Russia and Kazakhstan have stronger government interests in compensating the plaintiff and deterring defendants, the Court finds that either the Russian or Kazakhstani statute of limitations applies. The record establishes that plaintiff did not file its Complaint within one year of discovery of the allegedly fraudulent acts. Accordingly, the Court determines that plaintiff's non-RICO fraud claims are time-barred. They will be dismissed.

### D. Whether the Complaint Fails to Comply with Rule 9(b)

Defendants also move to dismiss the fraud claims for failure to plead with sufficient particularity. The Court need not consider this argument as it has already been noted that plaintiff's fraud claims will be dismissed as untimely pursuant to the applicable statute of limitations.

▪ To the degree that defendants also challenge plaintiff's RICO allegations, the Court is satisfied that plaintiff's Complaint satisfies Rule 9(b). Plaintiff has alleged and supplied dates for numerous occasions when Interform issued false letters of instructions to Nodfos. Plaintiff has also alleged that Buyanovsky and Emerel are the sole shareholders of Interform and that the company operates out of Buyanovsky's house. Under the circumstances, it is a fair inference that both defendants were aware of and furthered the fraudulent activity. Further, Buyanovsky and Emerel are the owners of PTKC, a company that allegedly began to suddenly receive millions of dollars for free. Taken together with the other well

plead facts in the Complaint, plaintiff need allege no further facts to meet Rule 9(b)'s pleading requirements. Defendants' motion to dismiss will be denied on this point.

### CONCLUSION

For the foregoing reasons, the Court will deny defendants' motions to dismiss plaintiff's RICO claims. Plaintiff has alleged a pattern of racketeering activity, and the Court has subject-matter jurisdiction over the RICO claims. Further, plaintiff's Complaint satisfies Rule 9(b). The Court will, however, grant defendants' motions to dismiss plaintiff's non-RICO fraud claims because the Court finds that either the Russian or Kazakhstani one-year statute of limitations applies.