NORTH SOUTH FINANCE CORPORATION; Dalia Product Corporation; Alef Investment Corporation N.V.; Saudi Arabian and European Finanz Corp., B.V.; Saudi European Investment Corporation, N.V., Plaintiffs–Appellants,

v.

Abdulrahman A. AL–TURKI; Saad Alissa; Roger Tamraz; Ahmed Mannai; Abdullah Taha Bakhsh; Jamal Jawa; Talat Othman; Srichand Parmanand Hinduja; Gopichand Parmanand Hinduja; Prakash Parmanand Hinduja; Amas Limited; Amas UK Ltd.; Amas S.A.; Amas Securities Inc.; Abdelaziz A. Al Fadda; Adel Al–Aali; Haji Hassan Al–Aali Trading And Contracting Co.; Ali Abdullah Tamimi; Abdullah Abbar; Ahmed A. Zainy; Yusef Bin Ahmed Kanoo; Samir Traboulsi; Abbas Gokal; Gulf International Holdings S.A.; Charles Keating; Investcorp S.A.; Abdulrahman Sharbatly; Abdullatif Ali Alissa, Marino B. Chiavelli; Ashok Parmanand Hinduja; Abdulaziz Kanoo; Abdullah Kanoo, Defendants,

Bouygues S.A.; Societe Civile de Labordere; Societe de Banque Privee (SBP); France Construction S.A.; Demachy Worms & Compagnie; Worms & Co., Inc.; Maison Worms & Compagnie; Worms & Compagnie; Societe d'Analyses et d'Etudes Bretonneau; Societe d'Amenagement Urbain et Rural, Defendants–Appellees.

No. 245, Docket 96–7290.

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1996.

Decided Nov. 20, 1996.

Mark A. Cymrot, Washington, DC (Baker & Hostetler, Washington, DC, on the brief), for Plaintiffs–Appellants.

Robert Ted Parker, San Francisco, CA (Jeffrey B. Kirschenbaum, Douglas A. Applegate, Berg, Ziegler, Anderson & Parker LLP, San Francisco, CA, Barry M. Bernstein, Bernstein & Arandia, New York City, on the brief), for Defendants–Appellees Bouygues S.A., et al.

Bruce H. Schneider, New York City (Michelle L. Pahmer, Stroock & Stroock & Lavan, New York City, on the brief), for Defendants–Appellees Demachy Worms & Compagnie, et al.

Before: WALKER and JACOBS, Circuit Judges, and CARMAN, Judge.*

JACOBS, Circuit Judge:

At issue on this appeal is the extraterritorial reach of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., specifically, the application of RICO to a dispute among groups of foreign companies and foreign nationals, arising out of the 1989 sale and reorganization of a French bank named Saudi European Bank ("SEB"). The plaintiffs—none of them American—are the holding companies that owned and eventually sold SEB, and the majority stockholders of the holding companies.[1] They allege under RICO a pattern of racketeering by two French investment banking groups that acquired the successor entity of SEB: the Bouygues Group and Worms Group.[2] The complaint alleges (in relevant part) that the Bouygues and Worms Groups:

(1) artificially depressed the sale price of SEB by corrupting the bank's general manager in Paris, who then understated the bank's liquidity for financial and regulatory purposes and misused information drawn from company sources (including a New York office); and

(2) manipulated post-sale transactions (some of them executed in New York) so that contingent payments of the purchase price would be fraudulently reduced or eliminated.

The United States District Court for the Southern District of New York (Cedarbaum, J.) ruled that the extraterritorial reach of RICO in a given case is determined by whether the "conduct" of the defendants in the United States "was material to the completion of a racketeering act." Holding that the plaintiffs here "failed to allege facts that show that the conduct of the members of the

---

* The Honorable Gregory W. Carman, Chief Judge, United States Court of International Trade, sitting by designation.

1. Saudi Arabian European Finanz Corporation ("SAEFC") is a Dutch corporation that owned in excess of 98 percent of SEB's shares prior to December 1989. Saudi European Investment Corporation ("SEIC"), a Netherlands corporation, was the sole shareholder of SAEFC. North South Finance Corporation and Dalia Products Corporation, both Panamanian corporations, and Alef Investments, a Netherlands corporation, all owned shares in SEIC.

2. Defendants-appellees Bouygues S.A., Societe Civile de Labordere Madrid, Societe D'Amenagement Urbain et Rural, France Construction S.A., Societe de Banque Privee, and Societe d'Analyses et d'Etudes Bretonneau are referenced as the "Bouygues Group" or "Bouygues"; defendants-appellees Demachy Worms & Compagnie, Maison Worms & Compagnie, Worms & Compagnie, and Worms & Co., Inc. are referenced as the "Worms Group" or "Worms."

Bouygues or Worms Groups in the United States" met that test, the court dismissed the claims at issue on appeal for lack of subject matter jurisdiction.[3] No appeal has been taken from the dismissal (on other grounds) of claims against other defendants and of certain additional claims against Bouygues and Worms.

We do not decide whether the test applied by the district court is the only available test; but no appeal has been taken on that issue. We affirm the district court's dismissal of the RICO claims against Bouygues and Worms on the ground—relied upon by the district court—that the conduct alleged to have been done by the defendants in the United States is insufficient to support subject matter jurisdiction under RICO.

## BACKGROUND

When reviewing a district court's dismissal of a complaint for lack of subject matter jurisdiction, we must assume that the material factual allegations in the complaint are true. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974)).

According to the amended complaint, the Bouygues Group used promises of future employment to enlist SEB's general manager, Eric Guillemin, in a corrupt scheme. Bouygues acted through its Chairman, Francis Bouygues and another high-ranking Bouygues employee named Jean–Francois Fonlupt. They induced Guillemin to prepare false daily reports, overstating SEB's liquidity problems, for circulation to French regulatory authorities, as well as to SEB management and one of SEB's holding companies, while the true and more encouraging results were conveyed to Fonlupt in regular phone conversations.[4] Guillemin also instructed his staff to take steps concerning interbank loans and deposits so that SEB's apparent liquidity would be falsely understated. Although Guillemin did these things in his office in France, the liquidity reports concerned all of SEB's agencies, including the New York office.

It is also alleged that Guillemin disclosed confidential information about the bank's assets and operations to Fonlupt, and assisted Fonlupt in devising strategies for negotiating with SEB management and the holding company. Some of this confidential information was obtained through telephone calls placed in France to SEB's New York office. After Bouygues and Worms acquired the bank, Guillemin was named Director General of SEB's reorganized successor, a preferment allegedly given as a reward for Guillemin's disloyalty to SEB.

It is further alleged that Bouygues and Worms stirred up regulatory pressure in France that was calculated to force the sale of SEB and to drive down the purchase price that Bouygues and Worms would pay for it. Thus (during negotiations in France for the sale of SEB), Fonlupt took the confidential information provided by Guillemin and gave it to Arthur Andersen & Co., which conducted an audit of SEB's books and records in Paris and New York. Arthur Andersen then allegedly prepared a report that falsely understated SEB's apparent net worth. The Bouygues and Worms Groups used the audit report and the liquidity reports to bolster false statements to French Banking authorities. Using these techniques, the Bouygues and Worms Groups allegedly threatened to cause French regulators to close SEB, and improperly acted to influence the Bank of France to pressure SEB to sell its assets.

Finally, it is alleged that Bouygues and Worms induced SEB's holding company to sell the bank to them by falsely stating that the low sales price would be supplemented by future payments received on certain high-risk loans provisioned on SEB's books, which payments Bouygues and Worms never intended to make.

---

**3.** The court also held that the fraudulent behavior abroad did not have substantial effects within the United States. Plaintiffs do not appeal this ruling.

**4.** According to the complaint, SEIC and SEB management relied upon SEB's managerial staff to compute SEB's liquidity ratio, which was an important regulatory indicator of the bank's health.

In December 1989, SEB's holding companies, SEIC and SAEFC, sold SEB to Maison Bouygues for the allegedly undervalued price of 20 million francs ($3.5 million) plus 85 percent of amounts to be recovered on the high-risk provisioned loans.[5] After the sale, SEB was reorganized and renamed Societe de Banque Privee ("SBP"). Plaintiffs allege that, although SBP has made collections on the loans that were provisioned on SEB's books, SEIC and SAEFC have never received the share that is due to them. According to the amended complaint and a supplemental RICO statement, Bouygues and Worms have evaded their payment obligations under the sales agreement by manipulating which entities received the payments on the provisioned loans, reorganizing SBP into two new entities, and closing SBP's New York office.

Some of the provisioned assets were outstanding loans on the books of SBP's New York office. In order to avoid paying plaintiffs their share of the amounts recovered on these loans, defendants allegedly concealed their successful collections (1) by manipulating the entities receiving payment of the provisioned assets, (2) by transferring money from the New York to the Paris office, (3) by channeling collections directly to the Bank's Paris office, and (4) by omitting collections made in New York from the accounting statements provided to plaintiffs. In addition, the management of SBP Paris decreased the asset base of the New York office by withdrawing funds and misdirecting loan payments. SBP Paris then notified the New York State Banking Department of its plan to close the New York office.

When SBP was on the verge of closing its New York office, the Resolution Trust Corporation ("RTC") obtained an injunction in federal district court in Arizona, barring SBP—which allegedly owed funds to Lincoln Savings & Loan—from reducing its assets in the United States below $9 million. Plaintiffs allege that SBP Paris violated the injunction by continuing to remove assets from the United States and by manipulating loan payments in order to avoid paying the plaintiffs, and concealed this misconduct by revaluing its balance sheets in July 1991. Following instructions from the Paris office, SBP New York overstated on its books the value or character of certain provisioned loans in order to create an illusion of compliance with the RTC injunction.

Plaintiffs commenced this action in April 1993, and filed an amended complaint on June 7, 1994. All defendants moved to dismiss the complaint on numerous grounds in September 1994. On November 21, 1994, plaintiffs moved for a preliminary injunction requiring defendants Bouygues and Worms to give prior notice of any transfers of assets currently located in the United States, other than those transfers occurring in the ordinary course of business. On January 27, 1995, the district court heard oral argument on defendants' motions to dismiss and plaintiffs' motion for a preliminary injunction. During oral argument, Judge Cedarbaum dismissed the complaint against certain defendants, and on October 11, 1995, the court denied (without opinion) plaintiffs' motion for a preliminary injunction.

In an opinion dated February 7, 1996, the district court: (1) dismissed the claims against certain defendants on the grounds (variously) of lack of personal jurisdiction, lack of standing, and lack of subject matter jurisdiction; (2) held that it lacked subject matter jurisdiction over plaintiffs' RICO claims against the Bouygues and Worms Groups; and (3) having dismissed all of the federal claims, declined to exercise pendent jurisdiction over plaintiffs' claims under New York State law. Judgment was entered on February 9, 1996.

## DISCUSSION

Plaintiffs appeal only the district court's dismissal of their RICO claims against the Bouygues and Worms Groups. Because we agree with the district court's conclusion that it lacked subject matter jurisdiction over these claims,—and affirm on that basis—we do not consider whether the court had per-

---

**5.** Prior to the sale, Guillemin transferred SEIC's dollar deposits in New York to Paris; after the sale, the defendants are alleged to have misappropriated one of these accounts worth at least $130,000. This misappropriation, if it occurred, took place entirely in Paris.

sonal jurisdiction over these claims or whether each of the plaintiffs had standing to sue. Nor do we reach the additional grounds justifying dismissal asserted by defendants. The only issue presented to us on appeal is the question of subject matter jurisdiction over plaintiffs' RICO claims.

The RICO statute is silent as to any extraterritorial application. Thus, "we must ascertain whether Congress would have intended that federal courts should be concerned with specific international controversies." *Alfadda v. Fenn,* 935 F.2d 475, 479 (2d Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991); *see also Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.) (Friendly, *J.*) (court must determine whether "Congress would have wished the precious resources of United States courts and law enforcement agencies" to be so devoted), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

■ Clearly, a corporate defendant that is a foreign entity is not for that reason alone shielded from the reach of RICO. *See Alfadda,* 935 F.2d at 479; *United States v. Parness,* 503 F.2d 430, 439 (2d Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). Less clear is the character and amount of activity in the United States that will justify RICO subject matter jurisdiction over a foreign entity. Although there is little caselaw in this Circuit regarding the extraterritorial application of RICO, *Alfadda,* 935 F.2d at 479, guidance is furnished by precedents concerning subject matter jurisdiction for international securities transactions and antitrust matters.

■ In considering the limits of subject matter jurisdiction over transnational securities frauds, our analysis in the past has focused on whether one of two alternative tests has been satisfied: the "conduct test" and the "effects test." *See Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121–22 (2d Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). Under the conduct test:

> [W]e entertain suits by aliens only where conduct material to the completion of the fraud occurred in the United States. Mere

preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction. Only where conduct "within the United States directly caused" the loss will a district court have jurisdiction over suits by foreigners who have lost money through sales abroad.

*Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983) (quoting *Bersch,* 519 F.2d at 993). This test focuses on how the conduct within the United States relates to the alleged fraudulent scheme, "on the theory that Congress did not want 'to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" *Id.* at 1045 (quoting *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1017 (2d Cir. 1975)).

■ The alternative "effects test" implements the intent of Congress that the securities laws be given extraterritorial application "in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities." *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206 (2d Cir.1968) (Lumbard, *C.J.*), *reh'g on other grounds,* 405 F.2d 215 (in banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). In this way, the United States prohibition of securities fraud "may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States." *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261–62 (2d Cir.1989). Transactions with only remote and indirect effects in the United States do not qualify as substantial. *Id.* at 262.

■ In antitrust cases, the analysis proceeds along similar lines, but there is more emphasis on the effects of the relevant conduct in the United States, and less emphasis on where that conduct took place. It has long been the case that the antitrust laws are enforceable against foreign entities participating in illegal combinations within the United States. *See United States v. Pacific & Arctic Railway & Navigation Co.,* 228

U.S. 87, 106, 33 S.Ct. 443, 448–49, 57 L.Ed. 742 (1913). It is also settled that antitrust liability may attach to anticompetitive conduct occurring outside the United States, but having consequences here, if the conduct is intended to and actually does have an effect on United States imports or exports which the state reprehends. *United States v. Aluminum Co. of America,* 148 F.2d 416, 443–44 (2d Cir.1945) (L. Hand, *J.*); *see also Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 796, 113 S.Ct. 2891, 2909, 125 L.Ed.2d 612 (1993).

Thus, to some degree, the tests for asserting jurisdiction extraterritorially vary depending on the substantive law to be applied abroad.[6] In the context of this RICO action, the district court and the parties all assume that the conduct test and the effects test should apply here as we have applied them in securities fraud cases. Our opinion in *Alfadda v. Fenn,* 935 F.2d 475 (2d Cir.1991) lends some support to that view.[7] However, the tests developed in securities and antitrust cases are premised upon congressional intent in enacting the Securities Exchange Act and the antitrust statutes, not the intention of Congress concerning RICO. *See Psimenos,* 722 F.2d at 1045; *Schoenbaum,* 405 F.2d at 206. We therefore do not assume that congressional intent in enacting RICO justifies a similar approach to the statute's foreign application.

■ In this case, plaintiffs apparently concede that they cannot demonstrate "substantial effects," because the sole ground of appeal is the district court's denial of jurisdiction under the conduct test. But it is not at all clear to us that the conduct test, as it has developed in foreign securities fraud cases, governs in cases involving the extraterritorial application of RICO. The rationale of the conduct test is that Congress did not want the United States to become an exporter of fraudulent security instruments. *Vencap,* 519 F.2d at 1017. This reasoning does not necessarily support application of RICO to a scheme that is linked solely to the United States by alleged predicate acts of mail and wire fraud. It may be that the effects-oriented approach borrowed from antitrust cases is an equally or even more appropriate test, especially since "the civil action provision of RICO was patterned after the Clayton Act." *Agency Holding Corp. v. Malley–Duff & Assoc.,* 483 U.S. 143, 150, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987). Moreover, RICO (like the antitrust laws) provides for treble damages, which heightens concerns about international comity and foreign enforcement. *Compare* 18 U.S.C. § 1964(c) with 15 U.S.C. § 15(a).

As these considerations show, specifying the test for the extraterritorial application of RICO is delicate work. That work has not been done, but we need not do it now. Plaintiffs do not challenge on appeal the district court's use of the conduct test and we agree with the district court that plaintiffs have failed to allege facts sufficient to satisfy that test.[8] Moreover, the ultimate inquiry is, as noted above, whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [foreign transactions] rather than leave the problem to foreign countries." *Bersch,* 519 F.2d at 985; *see also Alfadda,* 935 F.2d at 478. Viewing this case in that light, we have no doubt that the district court was without jurisdiction over a controversy involving foreign victims who sold a foreign entity to foreign defrauders in a foreign transaction lacking significant and material contact with the United States.

Plaintiffs relied on links to New York, some in the period prior to the sale of the

---

6. *See generally* Kristen Neller, Note, Extraterritorial Application of RICO: Protecting U.S. Markets in a Global Economy, 14 Mich. J. Int'l L. 357, 364–77 (1993); Note, Predictability and Comity: Toward Common Principles of Extraterritorial Jurisdiction, 98 Harv. L.Rev. 1310, 1311–1318 (1985).

7. In *Alfadda,* however, we were concerned primarily with subject matter jurisdiction over the plaintiffs' securities fraud claims under the conduct test. 935 F.2d at 478–79. Little additional analysis or discussion was needed to hold that subject matter jurisdiction existed over the RICO claims as well, since the securities fraud violations "were predicate acts which occurred primarily in the United States." *Id.* at 480.

8. As noted, were we to apply an effects-oriented approach, plaintiffs evidently concede that they could not satisfy this test.

bank, and some in the post-sale period. Pre-sale, plaintiffs allege that: (1) the false liquidity reports distributed by Guillemin concerned, *inter alia,* the New York office; (2) Guillemin disclosed confidential information, some of which he obtained in the course of telephone calls to New York; and (3) an auditor, retained by Fonlupt to conduct a review of SEB's finances in New York, prepared a report which falsely understated SEB's worth, and which then was used to make misrepresentations to French regulators. According to plaintiffs, this conduct helped the defendants fraudulently devalue SEB, thereby reducing the price that plaintiffs could negotiate in the sale of the bank.

■ As the district court concluded, this pre-sale conduct (assuming that it all occurred) is conduct that is "merely preparatory to the fraud," *see Alfadda,* 935 F.2d at 478, rather than conduct that is both material to the completion of the fraud and the direct cause of the alleged injury—as is required to support subject matter jurisdiction under the conduct test. *See Psimenos,* 722 F.2d at 1046. The alleged corruption of Guillemin by Bouygues and Worms occurred in France; Guillemin's acts of alleged disloyalty to SEB were done in France; his calls to New York were placed from France; and Arthur Andersen was retained in Paris through its French affiliate. At most, Bouygues, Worms and Guillemin obtained information from New York that facilitated the fraud in France. None of the conduct in New York can be construed as a material component of the fraud. We agree with the Ninth Circuit that:

> There is no reason to extend the jurisdictional scope of RICO to make criminal the use of the mail and wire in the United States as part of an alleged fraud outside the United States. We do not suppose that Congress in enacting RICO had the purpose of punishing frauds by aliens abroad even if peripheral preparations were undertaken by them here.

*Butte Mining PLC v. Smith,* 76 F.3d 287, 291 (9th Cir.1996).

9. We also agree with defendants that the conduct surrounding the Arizona injunction cannot serve as a basis for subject matter jurisdiction. The injunction was not issued to protect the plaintiffs

The post-sale links to New York are even more attenuated. Plaintiffs allege that, after the bank was sold, the defendants avoided paying the sellers their share of the assets that were provisioned on the books of SBP New York (1) by instructing the payors or the SBP New York staff to deliver the funds directly to SBP Paris, (2) by fraudulently altering the books of SBP New York, and (3) by closing down SBP New York. Thus, plaintiffs insist that the harm they have suffered is largely the result of the fraudulent manipulation of the provisioned assets in New York.

■ We agree with the district court that the post-sale conduct of Bouygues and Worms in the United States was not material to the completion of the fraud and thus cannot serve as a basis for subject matter jurisdiction. The transfer of repayments from New York to Paris did not prevent plaintiffs from getting their purchase price. The injury to plaintiffs (if any) took place in Paris when Bouygues and Worms, having received payment of the proceeds of provisioned assets, failed to remit the plaintiffs' share. Nothing in the bank sale agreement required that the assets be kept in New York, and plaintiffs' right to a percentage of the provisioned loans did not depend on the loan repayments being made directly to SBP's New York office. Thus, the alleged manipulation of assets in New York and the subsequent closing of the New York office were immaterial to the completion of the alleged fraud and were not the direct causes of any of plaintiffs' claimed losses. Accordingly, this conduct cannot furnish a basis of subject matter jurisdiction.[9]

### CONCLUSION

The judgment of the district court dismissing plaintiffs' complaint for lack of subject matter jurisdiction is affirmed.

and thus its alleged violation had nothing to do with plaintiffs; it certainly caused them no direct harm.