**JOHNSON ELECTRIC NORTH AMERICA INC. and Johnson Electric Industrial Manufactory, Ltd., Plaintiffs,**

**v.**

**MABUCHI MOTOR AMERICA CORP. and Mabuchi Motor Co., Ltd., Defendants.**

**Mabuchi Motor America Corp. and Mabuchi Motor Co., Ltd., Counterclaim–Plaintiffs,**

**v.**

**Johnson Electric North America Inc., Johnson Electric Industrial Manufactory, Ltd. and Trans–Hudson Motor Corporation, Counterclaim–Defendants.**

No. 88 Civ. 7377(WCC).

United States District Court,
S.D. New York.

May 31, 2000.

Moses & Singer LLP, New York City, Stephen N. Weiss, Gregory J. Fleesler, Kimberly Klein, of counsel, for plaintiffs and counterclaim-defendants Johnson Electric North America Inc. and Johnson Electric Industrial Manufactory, Ltd.

Baker & McKenzie, New York City, Robert B. Davidson, of counsel, Baker & McKenzie G.J.B.J., Tokyo, Japan, John C. Kakinuki, of counsel, Kile McIntyre Harbin & Lee LLP, Washington, D.C., Bradford E. Kile, Richard A. Sterba, of counsel, for defendants and counterclaim-plaintiffs.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs, Johnson Electric North America, Inc. ("JENA") and Johnson Electric Industrial Manufactory, Ltd. ("JEI") (collectively, "Johnson"), commenced this action to obtain a declaration that defendants' patents are invalid and that plaintiffs did not infringe the patents. Defendants, Mabuchi North America Corp. ("Mabuchi America") and Mabuchi Motor Co., Ltd. ("MMC") (collectively, "Mabuchi"), brought counterclaims for patent infringement and civil RICO violations. Presently before this Court is plaintiffs' motion for summary judgment on defendants' RICO claims. For the reasons stated below, that motion is granted.

## BACKGROUND

JEI, a Hong Kong corporation, and JENA, a Connecticut corporation, are in the business of making small motors for a wide variety of products, including hair dryers, portable tools, and power door

locks in automobiles. MMC, a Japanese corporation, and Mabuchi America, a New York corporation, also produce small motors and are together one of Johnson's most important competitors. Mabuchi maintains a sizeable research and development department and spent approximately $17 million on research and development in 1997. (Mabuchi Mem. at 6.) Mabuchi asserts that, in comparison, Johnson's research and development efforts have been modest. (Mabuchi Am. Answer ¶ 97.)

## I. *The '933 Patent Litigation*

In 1985, Mabuchi discovered Johnson motor No. HC315G, and believed that this motor was a direct infringement of Mabuchi U.S.Patent No. 4,431,933 ("the '933 patent"). Mabuchi sent one of Johnson's customers a letter informing the customer of the alleged patent infringement. In response, Johnson filed a lawsuit in the Southern District of New York alleging that Mabuchi was interfering with its contractual relations and seeking a declaration of the invalidity of the '933 patent. Mabuchi counterclaimed for patent infringement and filed a lawsuit against another one of Johnson's customers in the United States District Court for the District of Delaware. Mr. Roger Baines, Director of Research and Development for Johnson, admitted in his deposition that the drawings of Johnson's motor No. HC315G and the drawings of the '933 patent were substantially similar. (Baines Dep. at 91.)

In 1987, Johnson and Mabuchi resolved the '933 patent litigation in a written settlement agreement. Article 04.00 of the Settlement Agreement governs the resolution of future disputes between the parties. The agreement provides that if either party believes that the other is infringing its patent rights, the aggrieved party should provide written notice to the alleged infringer. (Settlement Agreement, Art. 04.01.) Further, the parties should use "their best efforts to reach a mutually satisfactory settlement of the dispute" within 90 days of the written notice. (*Id.*

at Art. 04.02.) If no resolution is reached within 90 days, the aggrieved party is entitled to commence litigation. (*Id.* at Art. 01.01 and 04.03.) In addition, the alleged infringer has the right to prevent the aggrieved party from contacting its customers if it "provided a means to undertake to assure the aggrieved party the legal and/or injunctive relief that would be available were it successful" in the infringement dispute. (*Id.*)

## II. *The '215 Patent Litigation*

Mabuchi's U.S.Patent No. 4,574,215 ("the '215 patent") issued on March 4, 1986. (Johnson Rule 56.1 Stmt. ¶ 1.) The invention contained in the '215 patent addressed a problem occurring in one of Mabuchi's motors that was used in automobile accessories, including power door locks and mirrors. Prior to the invention disclosed in the '215 patent, the motors contained a one-piece brushgear mechanism. The one-piece brushgear consisted of a terminal strip of rigid metal and a carbon brush attached at the end. The terminal strip's rigidity created problems, as the terminals often broke under mechanical pressure.

Mabuchi directed the efforts of its research and development department to address this mechanical problem. Mr. Takachi Mabuchi, the president of MMC and Mabuchi America, personally participated in the design process and produced the invention claimed in the '215 patent.

The '215 patent teaches the use of a two-piece brushgear composed of a terminal strip and a separate commutator strip upon which the carbon brush is mounted. The terminal and commutator contactor strips are joined together by means of lateral projections on the terminal strip. The projections are bent and crimped onto the edges of the commutator contractor strip to secure the two pieces together. The brushgear is bent into an L-shape at the joint which fits into a corresponding L-shaped slot in the brush holder on the case cover. With the brushgear attached to the

brush holder, its terminal strip extends laterally through the motor case. On or about March 18, 1983, Johnson learned of the existence of Mabuchi's motor with the two-piece brushgear from JEI's distributor and agent D. Rögelein GmbH, a German corporation. Dieter Rögelein, Rögelein's employee, sent a letter dated March 17, 1983 via facsimile to Patrick Wang, JEI's officer, director and employee, which provided information about the Mabuchi motor and stated that Mabuchi "has taken the chance to get a good reference in the automotive market ..." and Johnson "would like to kick them out as soon as possible." (Mabuchi Am. Answer ¶ 106.)

Along with the letter, Rögelein sent one of the Mabuchi motors to Johnson in Hong Kong and requested that Johnson manufacture a comparable motor. (Pl.Rule 56.1 Stmt. ¶ 3.) David Lam, a Johnson employee, was assigned the task of completing the design. In or about November 1984, Patrick Wang directed Lam to abandon his unsuccessful design efforts and simply copy the Mabuchi two-piece design. (*Id.* at ¶ 4; Mabuchi Am. Answer ¶ 107.) Lam made a copy of the Mabuchi motor sometime in November 1984. (Pl.Rule 56.1 Stmt. ¶ 5.)

In late 1986, Johnson altered its original brush gear structure which it had copied from Mabuchi. Mabuchi alleges that the second design included only minor revisions. (Mabuchi Am. Answer ¶ 109.)

Although Mabuchi filed an application for a United States patent in August 1983, it did not receive the '215 patent until March 1986. Baines, Johnson's Director of Research and Development, testified that he was aware of the United States '215 patent essentially upon its issuance in March 1986. (Baines Dep. at 151–52.)

It was not until July 15, 1988 that Mabuchi sent a notice of infringement letter to Johnson with respect to the '215 patent. Johnson then commenced the instant lawsuit in the Southern District of New York, securing an *ex parte* order to show cause

why Mabuchi should not be enjoined from contacting Johnson's customers. Judge Sprizzo denied Johnson's application for a preliminary injunction. (Mabuchi App., Ex. 11.) However, Mabuchi has not sued any of Johnson's customers for use, sale, or manufacture of the Johnson motor that copied the Mabuchi '215 patent design.

Although the '215 patent issued in 1986, Judge Sprizzo, upon Johnson's motion, ruled that no damages could be awarded for infringement of the '215 patent prior to July 15, 1988 because Mabuchi failed to comply with the patent marking statute, 35 U.S.C. § 287, until that date. (*See* Order of Sprizzo, J., July 7, 1994.) Although Judge Sprizzo certified the order granting Johnson's motion for immediate appeal pursuant to 28 U.S.C. § 1292(b), the Federal Circuit denied permission for leave to appeal. *See Johnson Electric North Am., et al. v. Mabuchi Motor Am. Corp., et al.,* Misc. Docket No. 405, 1997 WL 173208, 1997 U.S.App. LEXIS 7687, at *1–2 (Fed. Cir. March 20, 1997).

In its answer in the instant lawsuit, Mabuchi brought a civil RICO counterclaim alleging that Johnson's conduct:

> was undertaken as part of a fraudulent scheme and plan to enrich Johnson at the expense of Mabuchi. The purpose of the scheme and plan, and the specific intent of counterclaim-defendants, was to defraud Mabuchi, including proprietary rights in its inventions and designs, and patent rights therein, to enable Johnson to manufacture, use and sell competing motors without disclosing that the motors were copied and imitated from Mabuchi's patented and otherwise proprietary designs and without making the substantial intellectual and financial [research and development] effort undertaken by Mabuchi.

(Mabuchi Am. Answer at ¶ 111.)

This counterclaim is brought under 18 U.S.C. § 1962(c). Mabuchi further alleges that the scheme to defraud was carried out through acts involving criminal wire fraud

and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343. (*Id.* at ¶ 112.) Part of the alleged scheme included the sale and distribution of 9,600 motors incorporating the second design brush gear. (*Id.*) Mabuchi identifies the following communications as fraudulent:

(a) A purchase order dated February 18, 1988 sent by U.S. mail and/or facsimile by the purchaser of the 9,600 motors discussed above in Wisconsin to Johnson, care of its agent, Kaufman & Associates, in Glenview, Illinois. Johnson knew or reasonably foresaw that this purchase order would be placed;

(b) An order acknowledgment dated April 6, 1988 sent by U.S. mail and/or by facsimile by Johnson Electric North America, Inc. in Connecticut to the purchaser of the 9,600 motors discussed above in Wisconsin;

(c) A purchase order dated May 3, 1988 sent by U.S. mail and/or by facsimile by Johnson Electric North America, Inc. in Connecticut to Johnson Electric Industrial Manufactory, Ltd. in Hong Kong for the 9,600 motors discussed above;

(d) An invoice dated June 6, 1988 sent by U.S. mail and/or facsimile by Johnson Electric Industrial Manufactory, Ltd. in Hong Kong to Johnson Electric North America, Inc. in Connecticut for the 9,600 motors discussed above;

(e) A shipment advice dated June 24, 1988 sent by U.S. mail and/or by facsimile by Johnson & Associates Ltd., upon information and belief an affiliate of Johnson Electric Industrial Manufactory, Ltd., to Johnson Electric North America, Inc. in Connecticut for the 9,600 motors discussed above. Johnson caused this shipment advice to be sent or knew or reasonably foresaw that this shipment advice would be sent; and

(f) A shipment advice dated July 2, 1988 sent by U.S. mail and/or by facsimile by Johnson & Associates to Johnson Electric North America, Inc. in Connecticut for the 9,600 motors discussed above. Johnson caused this shipment advice would be sent or knew or reasonably foresaw that this shipment advice would be sent.

(g) An additional shipment of 400 motors during or around the week of July 15, 1988, reaching Kaufman & Associates' customer on or after July 20, 1988, to result in total shipments of 10,000 motors.

(*Id.* at ¶ 115.)

Although Johnson acknowledges the first six mailings listed above and admits that 9,600 motors were sold to a customer in Wisconsin, Johnson disputes the additional mailing of 400 motors listed in paragraph 115(g) of the Amended Answer. (Pl.Rule 56.1 Stmt. ¶¶ 6–11.) In its opposition to the instant motion for summary judgment, Mabuchi includes a copy of two letters dated July 15, 1988 from Johnson to a customer discussing the shipment of motors. (Mabuchi App., Ex. 12.) It appears that one of the letters includes handwritten notes indicating that the Johnson sales representative communicated with the customer. (*Id.*) Mabuchi argues that these handwritten notes evidence a telephone conversation. Therefore, Mabuchi puts forth these letters as evidence of two additional mailings and one additional use of wire. (Mabuchi Mem. at 15 n. 9.) Further, Mabuchi argues that the sales of the Johnson motor that allegedly infringed upon the '933 patent, made to customers in the United States in 1985 and 1986, were part of the alleged scheme to defraud.

Mabuchi further alleges that Johnson, Patrick Wang, Dieter Rögelein and D. Rögelein GmbH, have formed and continue to maintain an "association in fact" that is an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Mabuchi also alleges that Johnson, Patrick Wang, Dieter Rögelein and D. Rögelein GmbH were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) employed by and/or associated with an enterprise.

Mabuchi asserts that Johnson's "ongoing pattern of copying and imitating various

patented and otherwise proprietary Mabuchi designs and/or infringing and inducing infringement of various Mabuchi patents ...." was a part of Johnson's regular way of doing business. (*Id.* at ¶ 117.) On this basis, Mabuchi argues that there is reason to believe that the fraudulent scheme will continue.

Mabuchi alleges that as a result of Johnson's racketeering activity, it suffered financial losses from lost sales of its motors to potential customers that purchased Johnson's motors and from price erosion of the motors.

Mabuchi also brings a counterclaim for racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Mabuchi alleges that Johnson, Patrick Wang, Dieter Rögelein and D. Rögelein GmbH unlawfully, willfully and knowingly conspired to violate 18 U.S.C. § 1962(c).

## DISCUSSION

### I. *Summary Judgment Standard*

A district court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995). The party seeking summary judgment has the burden of showing that no genuine factual dispute exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### II. *Subject Matter Jurisdiction*

Plaintiffs allege that there is no subject matter jurisdiction over Defendant's RICO counterclaim because RICO does not apply extraterritorially in this situation. For the following reasons, subject matter jurisdiction exists.

▮ In determining subject matter jurisdiction, the Court may go beyond the pleadings and settle jurisdictional disputes with reference to affidavits and other materials. *Antares Aircraft LP v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds*, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992).

Johnson urges this Court to find that the alleged fraud occurred outside the United States, and thus to apply the conduct or effects test to determine whether there is jurisdiction. *See North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1050 (2d Cir.1996). However, where racketeering activities, including mail or wire fraud, occur within the United States, it is unnecessary to apply any test for determining the extraterritorial reach of the statute. *Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*, 842 F.Supp. 1567, 1570 (S.D.N.Y.1994) *aff'd* 59 F.3d 20 (2d Cir.1995). As a threshold matter, then, this Court must first determine whether the alleged acts are extraterritorial in nature. *See id.*

▮ "The mere fact that the corporate defendants are foreign entities does not immunize them from the reach of RICO." *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.1991). Where RICO predicate acts occurred primarily in the United States, jurisdiction exists. *Id.* at 479; *Nagoya Venture Ltd. v. Bacopulos*, No. 96 Civ. 9317, 1998 WL 307079, at * 3–4 (S.D.N.Y. June 11, 1998). Further, domestic communications or negotiations that were material to the completion of the alleged fraud are sufficient to confer jurisdiction on the court. *C.A. Westel De Venezuela v. AT &*

*T Co.*, No. 90 Civ. 6665, 1992 WL 209641, at *16–17 (S.D.N.Y. Aug.17, 1992).

In the current action, all of the allegedly fraudulent mailings took place either exclusively or partially within the United States through the use of the United States Postal Service. The purchase orders, invoices, and shipment communications were all carried by United States mail. The sale of the allegedly infringing motors was within the United States. Although Mabuchi Motor Co. is a Japanese corporation, it has an American subsidiary, Mabuchi Motor America Corp., and both corporations do business in the United States. This is not a case of two parties with little or no connection to the United States. *See Nagoya Venture Ltd.*, 1998 WL 307079, at *4 (stating that cases in which the parties and conduct have a clear connection to the United States present none of the problems of extraterritorial application of RICO).

In *C.A. Westel De Venezuela*, the court found that although the plaintiff incurred its injury outside the United States, the use of the United States postal system for at least some of the communications between the plaintiff and the defendant was sufficient to satisfy the jurisdictional requirement where these communications included the defendants' allegedly false representations. 1992 WL 209641, at *17.

Mabuchi alleges several uses of the United States postal system for the transportation of fraudulent mailings. These mailings include the purchase orders for the motors, the invoices for the motors, the shipment advisement, and two shipments of motors. Mabuchi alleges that the sale of the motors was completed with the use of the United States postal system in violation of the RICO statute. Thus, Mabuchi has alleged sufficient activity occurring inside the United States to fall within the RICO statute.

Even if it were necessary for this court to apply the effects and conduct tests, jurisdiction would still exist. In determining whether a statute should apply extraterritorially, the court must decided whether Congress would have intended the " 'precious resources of the United States courts' to be devoted to such transactions." *Alfadda*, 935 F.2d at 477. Two tests have emerged to judge the applicability of RICO to extraterritorial transactions. *North South Finance Corp.*, 100 F.3d at 1050.

The first standard is the conduct test, which predicates jurisdiction on finding that conduct " 'within the United States directly caused' the loss" alleged in the complaint. *Id.* The second test is the effects test, which is satisfied when the conduct (the fraud) produces substantial effects or injury within the United States. *Id.* at 1051. Because it is not clear which test should be used in the context of RICO, jurisdiction will exist where either test is satisfied. *See id.; see also Madanes v. Madanes*, 981 F.Supp. 241, 249 (S.D.N.Y.1997) (finding that the most equitable solution is to find jurisdiction where either test is satisfied.) Thus, if there was either conduct within the United States that directly caused the loss to Mabuchi, or if there was conduct outside the United States that has substantial negative effects within the United States on Mabuchi, this court has jurisdiction. *See id.*

Mabuchi's RICO claim meets both tests. First, as previously noted, the alleged mail fraud leading to the sale of the motors occurred in the United States with the use of the United States Postal Service. Further, the sale of the motors was within the United States and was completed through United States mail. Thus, conduct that was an important part of the alleged fraud occurred within the United States. Mabuchi has alleged sufficient facts to show that the conduct test would be satisfied.

Second, there is a substantial effect within the United States as a result of the alleged infringement. Mabuchi, as a United States corporation, alleged injury within the United States due to the sale of the allegedly infringing motors—a loss of sales

to potential United States customers and an erosion of the price of its motors here. In fact, this injury is the subject of the counterclaim for RICO. Because Mabuchi has alleged that it suffered sufficient injury within the United States, the effects test is also satisfied. Therefore, this Court has subject matter jurisdiction over Mabuchi's RICO counterclaims.

## III. *Mabuchi's RICO Counterclaims*

Mabuchi asserts that Johnson's conduct violated 18 U.S.C. § 1962(c), a section of the RICO statute that provides:

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

■ To establish a claim for damages under 18 U.S.C. § 1962(c), Mabuchi must allege: (1) that the defendants (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *See Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983). Furthermore, Mabuchi must show that it was "injured in [its] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

Johnson challenges Mabuchi's RICO claims on various grounds. First, Johnson argues that Mabuchi cannot prove racketeering activity on the basis of patent infringement. Further, even if Mabuchi can establish the predicate acts of mail fraud, Johnson asserts Mabuchi has failed to plead fraud with particularity. Johnson also argues that Mabuchi has failed to establish the existence of an enterprise.

Finally, Johnson argues that Mabuchi cannot satisfy the RICO pattern requirement.

### A. *Racketeering Activity*

A RICO violation requires proof of at least two predicate acts of racketeering activity. *See* 18 U.S.C. § 1961(5). Here, Mabuchi alleges predicate acts of mail and wire fraud as a basis for RICO violations. The mail and wire fraud statutes prohibit the use of the interstate mail or wires to further any scheme to defraud or to obtain money or property by false or fraudulent pretenses. *See* 18 U.S.C. §§ 1341, 1343. Because the elements necessary to establish violations of the mail and wire fraud statutes are essentially the same, the identical analysis is applied to both. *See Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

■ Johnson first challenges Mabuchi's RICO claims on the basis that Mabuchi has not alleged any racketeering activity. Johnson argues that Mabuchi's RICO claims rely on patent infringement as the predicate act of racketeering. Patent infringement is not a predicate act enumerated by the RICO statute, and thus cannot be the basis of a RICO claim. *See Michod v. Walker Magnetics Group, Inc.*, 115 F.R.D. 345, 347 (N.D.Ill.1987).

Mabuchi concedes that patent infringement alone is not racketeering activity, but argues that Johnson mischaracterizes the nature of the fraud alleged. Instead of relying on patent infringement alone, Mabuchi contends that "Johnson's use of the mail and wires in the context of the pattern of willful activity alleged in Mabuchi's counterclaims constitutes mail and wire fraud." (Mabuchi Mem. at 13.) Mail and wire fraud are enumerated as predicate acts under RICO. *See* 18 U.S.C. § 1961(1).

■ The essential elements of a mail fraud violation are: (1) a scheme to defraud; (2) of money or property; and (3) use of the mails to further the scheme. *See United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991).

Here, Mabuchi's allegations of mail fraud are grounded on mailings between JENA, JEI, a Johnson customer in Wisconsin, and Johnson & Associates, an affiliate of JEI, concerning the alleged purchase by the Wisconsin customer of 10,000 motors in two separate shipments of 9,600 and 400 motors. Johnson does not dispute that it used the mail in effecting the sale of 9,600 motors to a Wisconsin customer. (Pl.Rule 56.1 Stmt. ¶¶ 6–11.)

However, Johnson does argue that, as a matter of law, Mabuchi cannot show that Johnson participated in a scheme to defraud. Mabuchi asserts that the undisputed mailings furthered a scheme to defraud that consisted of the sale of motors that Johnson knew infringed Mabuchi's patents. However, instead of arguing that Mabuchi was defrauded by Johnson's conduct, Mabuchi argues that these sales defrauded Johnson's customers. The basis for Mabuchi's argument is that these sales violated section 2–312(3) of the Uniform Commercial Code, which creates a warranty of non-infringement by a merchant. According to Mabuchi, by failing to disclose to its customers that the motors infringed Mabuchi's patents, Johnson participated in a scheme to defraud.

Johnson challenges Mabuchi's mail and wire fraud claims on the basis that (1) Mabuchi lacks standing to bring a fraud claim based upon misrepresentations made to Johnson's customers; and (2) Mabuchi cannot prove Johnson participated in a scheme to defraud.

■ First, Johnson asserts that "in alleging mail or wire fraud as predicate acts in a civil RICO complaint, it is necessary to allege that the injured party relied on the fraudulent misrepresentations of the defendant, and that the reliance was the cause of the injury." (Johnson Mem. at 11) (quoting *B.V. Optische Industrie v. Hologic, Inc.,* 909 F.Supp. 162, 170 (S.D.N.Y.1995)) However, this Court, in

*Shaw v. Rolex Watch U.S.A., Inc.,* 726 F.Supp. 969, 972 (S.D.N.Y.1989), held that the mail fraud statute does not require a showing of reliance. We went on to hold that "[a] plaintiff who is injured as a proximate result of fraud should be able to recover regardless of whether he or a third party is the one deceived." *Id.* at 973. The Second Circuit, in dicta, has expressed approval of the proposition that the party deceived in a mail fraud case must also lose money or property. *See Corcoran v. American Plan Corp.,* 886 F.2d 16 (2d Cir.1989); *United States v. Evans,* 844 F.2d 36, 39 (2d Cir.1988). However, because in both *Evans* and *Corcoran* the plaintiff was the party who was deceived and not the party injured, this Court has narrowly read those cases to mean that a plaintiff who has not suffered an injury lacks standing. *See Shaw,* 726 F.Supp. at 973. Here, just as in *Shaw,* the RICO plaintiff alleged that it was injured through the deceit of a third party. *Id.* Mabuchi has alleged that it suffered financial injuries through the deceit of Johnson's customers because it lost potential sales. These allegations are sufficient to establish standing to bring a RICO claim based upon mail and wire fraud.

■ However, Johnson also argues that Mabuchi cannot prove the existence of a scheme to defraud. As this Court has previously held, "where the fraudulent scheme is premised upon an inadequate pleading of common law fraud, the allegations of mail and wire fraud must fail." *Clifford v. Hughson,* 992 F.Supp. 661, 669 (1998) (citations omitted).[1] To state a claim for common law fraud under New York law, a plaintiff must prove (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; and (4) reasonable reliance on the part of the plaintiff; (5) that causes damage to the

---

1. We note, just as we did in *Clifford,* 992 F.Supp. at 669 n. 3, that the Second Circuit has not yet determined whether a claim for mail fraud should be dismissed if it does not state a claim for common law fraud.

plaintiff. *Schlaifer Nance & Co. v. Estate of Andy Warhol, et al.,* 119 F.3d 91, 98 (2d Cir.1997).

Here, Mabuchi alleges that Johnson made a material omission by failing to disclose to its customers that the motors Johnson sold infringed Mabuchi's patents. Proof of fraud requires affirmative misrepresentations or omissions of material information that the defendant has a duty to disclose. *See United States v. Altman,* 48 F.3d 96, 102 (2d Cir.1995). The duty to disclose may arise from a fiduciary duty or from an explicit and independent statutory requirement. *See United States v. Dowling,* 739 F.2d 1445, 1449 (9th Cir.1984), *rev'd in part on other grounds, Dowling v. United States,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985).

Mabuchi argues that under section 2–312(3) of the Uniform Commercial Code, Johnson had a duty to disclose that its motors infringed upon Mabuchi's patents. Section 2–312(3) states in relevant part:

> (3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be free of the rightful claim of any third person by way of infringement or the like ...

U.C.C. § 2–312(3).

The policy underlying section 2–312(3) is "that a merchant who regularly deals in like goods has a duty to insure that no claim of infringement by a third party mars the buyer's title ..." *Dolori Fabrics, Inc. v. The Limited, Inc.,* 662 F.Supp. 1347 (S.D.N.Y.1987). Courts have interpreted section 2–312(3) to entitle the buyer of an infringing good to indemnification from the seller for any claims by a third party for infringement. *See id.·* (holding that catalogue vendor who purchased infringing dresses for resale was entitled to indemnification from the manufacturer); *see also Golden Trade v. Jordache,* 143 F.R.D. 504, 507 (S.D.N.Y.1992) (finding that where the third-party defendant manufactured and sold jeans to the defendant that infringed upon the plaintiff's patent, the third-party

defendant may be liable for consequential damages paid by the defendant to the plaintiff for patent infringement and for the costs of the litigation).

The duty to indemnify customers does not necessarily create a duty to disclose. In *Dowling,* the Ninth Circuit found a fraudulent scheme based upon the failure of the defendant to fulfill the duty implicit in the Copyright Act, 17 U.S.C. § 115, which required the defendant to notify the copyright proprietors of his intention to manufacturer and distribute infringing records. 739 F.2d at 1450. In *United States v. LaMacchia,* the court distinguished *Dowling* on the basis that no fiduciary relationship existed between the defendant and the manufacturers whose software copyrights he allegedly infringed and that there was no independent statutory duty of disclosure because there is no software equivalent to the compulsory licensing scheme for copyrighted records. *United States v. LaMacchia,* 871 F.Supp. 535, 542–43 (D.Mass.1994).

■ As in *LaMacchia,* Johnson had no independent statutory duty of disclosure. The Copyright Act, which created the duty to disclose in *Dowling,* reads in relevant part:

> (1) Any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner.

17 U.S.C. § 115(b)(1).

In contrast, U.C.C. § 2–312(3) provides that the merchant impliedly warrants that "the goods shall be delivered free of the rightful claim of any third person by way of infringement ..." There is no requirement of notice to the customer in the plain language of the U.C.C. provision. Further, Mabuchi points to no case that imposed a duty to disclose based upon U.C.C. § 2–312(3). Although "this section has not

been heavily litigated" in the courts, *Bonneau Co. v. AG Indus., Inc.*, 116 F.3d 155, 157 (5th Cir.1997) (quoting JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 9–12, at 538 (4th ed.1995)), the case law that does exist uniformly interprets the section to require only indemnification. Further, Mabuchi cannot assert that Johnson has breached the duty of indemnification because Johnson's customers have not yet been subject to any litigation. Mabuchi cannot show that Johnson made a material omission as required by the mail and wire fraud statutes.

Even if Johnson made a material omission, Mabuchi must also prove that Johnson intended to defraud its customers. Mabuchi puts forth no evidence of intent to defraud, stating only that the elements of fraud are fulfilled because:

> Johnson carried out its scheme by systematically and knowingly copying, imitating and selling products containing Mabuchi's patented and proprietary designs and thereby converting to itself the benefits of the proprietary inventions and research efforts.... In order to sell its infringing products, Johnson continued its fraudulent activity by failing to disclose to its customers the material fact that the motors it was selling were not products Johnson was entitled to sell at all, but were products which Johnson knew infringed Mabuchi's patents.

(Mabuchi Mem. at 17.)

As this Court reads them, Mabuchi's accusations are nothing more than claims of knowing and deliberate patent infringement. Mabuchi bases their RICO claims on the same activity alleged in their patent infringement claims. *See Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir.1996) (upholding district court's conclusion that the plaintiff had failed to state a RICO claim where RICO counts were based upon same activity alleged in the copyright infringement claims); *Damiano v. Sony Music Entertainment, Inc.*, 975 F.Supp. 623, 631 (D.N.J.1996) (holding that the plaintiff's

RICO claims must fail because "they are actually nothing more than copyright infringement claims presented as mail fraud").

To establish a scheme to defraud, an element of deception must be present. *See Naso v. Park*, 850 F.Supp. 264, 274 (S.D.N.Y.1994) (Conner, Senior J.) (citations omitted). In *Naso*, the plaintiffs were patent proprietors that brought both patent infringement and RICO claims against a manufacturer and distributor of microfilm reels. *Id.* at 268. This court found that the plaintiff failed to allege a scheme to defraud because:

> It is true that the alleged patent infringement may harm plaintiffs and deprive them of their exclusive right to market the microfilm reels at issue; however, such patent infringement is not fraud because it contains no deceptive element. There are no allegations that defendants represented to customers that their reels did not infringe valid patent or trademark rights of plaintiffs. Nor is there any allegation that the purchasers of the reels sold by defendants were deceived to their detriment, that is, that they preferred reels made by plaintiffs and were deceived into accepting inferior reels made by someone else. *See Ford Motor Co. v. B & H Supply, Inc.*, 646 F.Supp. 975, 1001, n. 36 (D.Minn.1986) (plaintiffs failed to establish mail fraud, and hence racketeering activity, where no evidence was produced that defendants fraudulently marketed and sold copyright and trademark infringing automobile parts as genuine Ford parts; i.e., marketing and sales of infringing goods through use of the mails and wires is not in itself mail fraud without actual misrepresentation or omission); *Cf. Shonac Corp. v. AMKO Int'l, Inc.*, 763 F.Supp. 919, 940 (S.D.Ohio 1991) (plaintiff failed to establish scheme to defraud where exporter defendant neither made nor was aware of misrepresentations made by purchasing agent defendant that goods did not

infringe trademark owner's rights). Nor are there allegations that defendants somehow perpetrated a fraud on the Patent and Trademark Office by, for example, obtaining its own patent through material false representations or non-disclosures. *Id.* at 274–75.

In a footnote of their Memorandum of Law, Mabuchi attempts to distinguish *Naso* on the grounds that U.C.C. § 2–312(3) imposes a duty to disclose that the motors are infringing, and that Johnson's failure to fulfill that duty is sufficient to create the requisite deceptive element in fraud. However, as discussed above, U.C.C. § 2–312(3) does not impose a duty to disclose, only a duty to indemnify.

Mabuchi's reliance on *Formax, Inc. v. Hostert*, 841 F.2d 388 (Fed.Cir.1988) is misplaced. In *Formax*, the defendant, a former employee of the plaintiff, was alleged to have stolen some drawings claimed to be trade secrets and to have infringed the plaintiff's patent. The court found that the misappropriation of trade secrets by an employee falls within the definition of fraud under the mail and wire fraud statutes. *Id.* at 390. Similarly, in upholding the mail fraud claims in *Carpenter*, the Supreme Court focused on the existence of a confidential relationship between the employee who misappropriated confidential information and his employer from which he took the information. 484 U.S. at 27–28, 108 S.Ct. 316. The instant case is easily distinguished from *Formax* and *Carpenter* because there is no confidential relationship between Johnson and Mabuchi—they are direct competitors. *See Advanced Power Sys., Inc. v. Hi–Tech Sys., Inc.*, No. 90–7952, 1992 WL 97826, at *6 (E.D.Pa. April 30, 1992) (finding no mail fraud where the plaintiff's competitor's employees allegedly posed as potential customers and then burglarized the plaintiff's offices to obtain trade secrets on the basis that there was no confidential relationship between the direct competitors). Further, although theft of trade secrets by an employee may be "the deprivation of something of value by trick, deceit, chicane or overreaching," *Carpenter*, 484 U.S. at 26, 108 S.Ct. 316, (defining "defraud"), Johnson's alleged infringement of a competitor's patent is not sufficiently deceptive to be part of a scheme to defraud under the mail and wire fraud statutes. Mabuchi's RICO counterclaims must be dismissed because patent infringement alone cannot be the basis for mail or wire fraud and U.C.C. § 2–312(3) does not impose a duty to disclose.

We note that Mabuchi has failed to point to, and this Court has been unable to locate, any case in which RICO claims based upon a scheme to defraud conducted through patent infringement have been upheld. To the contrary, this Court has located numerous cases in which RICO claims based upon patent or copyright infringement have been dismissed, even where the plaintiffs attempted to plead the claims as mail or wire fraud. *See, e.g., Smith*, 84 F.3d at 1217 (affirming dismissal of RICO claims alleging same activity alleged in copyright infringement claims); *U.S. Media Corp.*, 94 Civ.4849, 1996 WL 520901, at *13 (holding that "[a] copyright violation alone does not involve either affirmative misrepresentation or any duty to disclose. Such a violation may not be 'bootstrapped' into a violation of the mail or wire fraud statutes"); *B.V. Optische Industrie*, 909 F.Supp. 162 (granting motion to dismiss RICO claims based upon fraudulent acts before the United States Patent and Trademark office); *Naso*, 850 F.Supp. at 275 (dismissing RICO claims based upon mail fraud involving patent infringement because patent infringement is not deceptive); *Damiano*, 975 F.Supp. at 632 (granting summary judgment for the defendant on RICO claims based upon allegations that defendants engaged in mail fraud by selling recordings that stated that they were created by Bob Dylan).

We are mindful of the Supreme Court's direction that "RICO is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473

U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). However, this Court also recognizes that "in its private civil version, RICO is evolving into something quite different from the original conception of its enactors." *Id.* Given the lack of precedent supporting Mabuchi's RICO counterclaims, this Court declines to be the first to extend the reach of RICO to claims based upon patent infringement.

Because we find, on the basis of undisputed facts, that Mabuchi has failed to establish that Johnson participated in racketeering activity, we need not decide whether Mabuchi has shown that Johnson's conduct fulfills the pattern and enterprise requirements of the RICO statute.

### IV. *Mabuchi's RICO Conspiracy Claim*

Plaintiffs bring their RICO conspiracy claims under section 1962(d), which states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To survive summary judgment, Plaintiffs must allege some factual basis for a finding of conscious agreement among Johnson, Patrick Wang, Dieter Rögelein and D. Rögelein GmbH ·to commit at least two predicate acts. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25–26 (2d Cir.1990). Mabuchi has failed to show that Johnson's conduct constituted predicate acts under the RICO statute; thus Johnson, Wang and Rögelein could not have agreed to commit predicate acts. Consequently, Mabuchi's RICO conspiracy counterclaims pursuant to 18 U.S.C. § 1962(d) are dismissed.

### CONCLUSION

For the reasons stated above, Johnson's motion for summary judgment is granted. Clerk of the Court shall enter judgment for Johnson on Mabuchi's RICO counterclaims.

SO ORDERED.